# STATE v. GEORGE CARPENTER CURTIS.

190 N. W. (2d) 631.

July 9, 1971—No. 42283.

C. Paul Jones, State Public Defender, and Roberta K. Levy and Doris O. Huspeni, Assistant State Public Defenders, for appellant.

Warren Spannaus, Attorney General, James M. Kelley, Assistant Attorney General, William B. Randall, County Attorney, and Steven C. DeCoster, Assistant County Attorney, for respondent.

Heard before Knutson, C. J., and Nelson, Otis, Rogosheske, and Kelly, JJ.

OTIS, JUSTICE.

Defendant appeals from a conviction for possession of marijuana in violation of Minn. St. 618.02. The only issue is whether the search which resulted in the discovery of marijuana following defendant's arrest for a minor traffic violation was valid. We hold that it was not, and the evidence thus obtained should therefore have been suppressed.

On September 29, 1968, at about 10 p. m., Officers Thomas Burke and Robert R. Patsy of the St. Paul Police Department observed defendant driving south on Victoria Street in a car with defective taillights. He stopped at Selby Avenue and turned

right without signaling. Thereupon, the officers curbed the defendant. As he got out of his automobile and headed toward the squad car, the officers observed him take an object from his pocket or belt and throw it on the front seat of his car. The officers emerged from their vehicle and Officer Patsy searched defendant for weapons before putting him in the squad car. Officer Patsy testified that he felt the outside of defendant's pockets. He detected some object but couldn't tell what it was. It did not feel like a gun or knife. As the officer reached into the pocket, defendant seized a package from it and dumped part of the contents, later identified as marijuana, inside the squad car and on the ground. While this search was being conducted, Officer Burke walked to defendant's car and found a loaded .45 automatic revolver on the front seat.

Defendant moved to suppress the marijuana. After an extensive hearing the trial court denied the motion, holding that the search was reasonable as an incident of the arrest. At the so-called Rasmussen hearing, Officer Patsy testified that his purpose in stopping defendant was to check his driver's license. He was acquainted with defendant and had previously warned him against driving after suspension. At the time defendant was searched, Officer Patsy did not know defendant was driving without a license or that Officer Burke had found the loaded gun. Neither officer suspected defendant of having marijuana on his person or of being armed.[1] The only purpose in stopping defendant was to make a license check after observing his defective taillights and his failure to signal for a turn.[2]

The justification which the officers offered for searching de-

---

[1] Seizure of a wallet containing marijuana in the process of searching for weapons was held improper in State v. O'Neal, 251 Ore. 163, 444 P. (2d) 951.

[2] Under circumstances which had a striking similarity to these, the New Jersey Superior Court held the search of an automobile invalid in State v. Scanlon, 84 N. J. Super. 427, 202 A. (2d) 448.

fendant was the fact that they were about to put him in the squad car. Officer Patsy testified:

"A. We check everyone that gets into our squad car, yes.

\* \* \* \* \*

"Q. Do you, as a matter of course, go immediately into people's pockets to do this?

"A. When I put them in the squad car I do."

In the same vein, Officer Burke testified:

"Q. And as a matter of course, if you are going to place somebody in that back seat you are going to search before you do, or at least frisk him?

"A. Yes, we are.

"Q. That's a matter of course, is it not?

"A. Yes, sir.

"Q. Usually you will feel down and see whether there is anything suspicious as a weapon or anything might be dangerous to you, is that right?

"A. Yes, we do."

Neither officer expressed any concern for his personal safety. There was no testimony that they suspected defendant of any other criminal activity or were aware of any dangerous propensities on his part.

1. This was a routine arrest for a trivial traffic offense and nothing more. Under such circumstances, the weight of authority holds that a search of the driver's person is unlawful and violates U. S. Const. Amend. IV.[3] The marijuana seized should therefore have been suppressed. Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. ed. (2d) 1081, 84 A. L. R. (2d) 933.

---

[3] U. S. Const. Amend. IV and Minn. Const. art. 1, § 10, provide as follows: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

The United States Supreme Court has held that a police officer may make a reasonable search for weapons for his own protection where he has reason to believe he is dealing with an armed and dangerous individual. The test is whether a reasonably prudent man would be warranted in the belief that his safety or that of others was in danger. Terry v. Ohio, 392 U. S. 1, 27, 88 S. Ct. 1868, 1883, 20 L. ed. (2d) 889, 909; Sibron v. New York, 392 U. S. 40, 64, 88 S. Ct. 1889, 1903, 20 L. ed. (2d) 917, 935. Because in Sibron the officer thrust his hand into defendant's pocket and seized narcotics which he was looking for, the court found that the search was not in fact one for weapons but for contraband which it held to be inadmissible. As we have indicated, the officers in the matter before us pointed to no facts from which they could infer, before he was searched, that defendant was carrying a gun.

Two previous decisions have suggested the result we here reach. In State v. Harris, 265 Minn. 260, 268, 121 N. W. (2d) 327, 333, certiorari denied, 375 U. S. 867, 84 S. Ct. 141, 11 L. ed. (2d) 94, we held that police officers may not ordinarily make searches incident to simple traffic violations, and in State v. Clifford, 273 Minn. 249, 254, 141 N. W. (2d) 124, 127, we held:

"* * * A search for evidence in defendant's possession, incident to an arrest without a warrant, is reasonable if it is to seize weapons which may be used to assault an officer or effect an escape, or to prevent the loss or destruction of the fruits of the crime or the implements used in accomplishing it. Preston v. United States, 376 U. S. 364, 367, 84 S. Ct. 881, 883, 11 L. ed. (2d) 777, 780. None of these purposes has any application in the context of a relatively trivial traffic violation."

2. Although the authorities seem to agree that minor traffic violations do not justify a search for contraband where there is no evidence constituting the fruits or instrumentality of the offense, courts are divided with respect to the circumstances under which a search for weapons is lawful. A leading case which liberally construes U. S. Const. Amend. IV was decided by the

New York Court of Appeals in People v. Marsh, 20 N. Y. (2d) 98, 281 N. Y. S. (2d) 789, 228 N. E. (2d) 783. There, defendant was arrested for speeding. A search of his person produced policy slips for which he was prosecuted and convicted. Chief Judge Fuld, speaking for a majority of the court, held (20 N. Y. [2d] 101, 281 N. Y. S. [2d] 792, 228 N. E. [2d] 785):

"Although, as a general rule, when an individual is lawfully arrested, the police officer may conduct a contemporaneous search of his person 'for weapons or for the fruits of or implements used to commit the crime' * * *, we do not believe that the Legislature intended the rule to cover arrests for traffic violations. It is obvious that, except in the most rare of instances, there can be no 'fruits' or 'implements' of such infractions and the search, to be upheld, would have to be justified as one for weapons. But there is something incongruous about treating traffic offenders as noncriminals, on the one hand, and subjecting them, on the other, to the indignity of a search for weapons.

"The search for weapons is a special exception to the proscription against warrantless searches, and it should not be extended beyond its purpose of securing the safety of the officer and preventing an escape. A motorist who exceeds the speed limit does not thereby indicate any propensity for violence or iniquity, and the officer who stops the speeder has not even the slightest cause for thinking that he is in danger of being assaulted. We can only conclude that, even though the 'rules of criminal law are generally applicable' to traffic violations * * *, the Legislature never intended to authorize a search of a traffic offender unless, when the vehicle is stopped, there are reasonable grounds for suspecting that the officer is in danger or there is probable cause for believing that the offender is guilty of a crime rather than merely a simple traffic infraction."

The court concluded that no search for weapons is authorized as incident to an arrest for a minor traffic infraction unless the officer has reason to fear an assault or has probable cause for believing the defendant has committed a more serious crime. The

court there cited as authority Sobel, Current Problems in the Law of Search and Seizure, pp. 119-124, and People v. Watkins, 19 Ill. (2d) 11, 166 N. E. (2d) 433. Mr. Justice Sobel in his treatise stated that there can be no lawful search incident to an arrest for a traffic violation because there are no fruits of such crimes and only rarely will a search be required to protect a police officer's personal safety. However, he observed that if there are indications a more serious offense is involved the officer may detain the suspect for investigation without a search.

The Illinois decision to which the Marsh opinion referred was written by another distinguished jurist, Mr. Chief Justice Walter Schaefer. That court recognized as invalid searches arising from minor traffic violations but held that under the circumstances it was reasonable for the arresting officers to assume they were dealing with a more serious offense. The search which produced policy tickets was found constitutionally justified.

In Amador-Gonzalez v. United States (5 Cir.) 391 F. (2d) 308, the defendant was convicted of importing narcotics, and the United States Court of Appeals reversed. Defendant had been arrested for making an improper left turn, speeding, and failing to have a driver's license. The arrest was held to be a pretext for the search and seizure of narcotics found on defendant's person. Judge Wisdom there stated (391 F. [2d] 314) :

"A search incident to an arrest must have as one or more of its purposes the discovery of (1) the fruits of the crime; (2) instrumentalities used to commit the crime; (3) weapons or like material which put the arresting officer in danger or might facilitate escape; (4) contraband, the possession of which is a crime * * *, and, by a recent decision, (5) material which constitutes evidence of the crime or evidence that the person arrested has committed it * * *. Purposes 4 and 5 have no application here, because they require probable cause as a predicate for the search. There are of course no 'fruits' of the sort of traffic offenses Gonzalez may have committed. The only instrumentality is the car itself. The officers appeared to be in no danger: The

defendant was outside of his car at the time of the search and virtually surrounded by three police officers. Indeed, [the police officer] even acknowledged that he was in fact looking for narcotics.

"On the record before us, the evidence clearly demonstrates that the arrest of Gonzalez was a pretext to enable the arresting officers to search Gonzalez and his car. My brothers agree that the search was therefore unreasonable.

"I would go further. I would hold that, pretext or no pretext, a lawful arrest of an automobile driver for a traffic offense provides no lawful predicate for the search of the driver or his car —absent special circumstances.

* * * * *

"The significant element in this case is the danger that the lowly offense of a traffic violation—of which all of us have been guilty at one time or another—may be established as the basis for searches circumventing the rights guaranteed by the Fourth Amendment. This danger exists in lawful traffic arrests as well as in pretextual arrests. There are no fruits, instrumentalities, and contraband reasonably connected with an automobile driver's improper turn, speeding, and failure to have a driver's license—regardless of the arresting officer's motives."

3.   Two California court of appeal cases have declined to follow New York court's Marsh decision. People v. Graves, 263 Cal. App. (2d) 719, 70 Cal. Rptr. 509; People v. Weitzer, 269 Cal. App. (2d) 274, 290, 75 Cal. Rptr. 318, 329. In the Weitzer case, the police arrested defendant for speeding, patted him down, and seized from his person a matchbox of marijuana. While acknowledging the principle that the police may not use a traffic offense as a pretext for making a search involving unrelated crimes, the court held that the protection and safety of the arresting officer outweigh the indignity of a traffic offender's being subjected to a search for weapons. In reaching its decision, the court stressed the distinction between cases where a traffic arrest is used as a subterfuge and those where evidence is fortuitously

discovered in a routine arrest. Courts uniformly have forbidden the use of a minor traffic offense as a pretext for searches directed at unrelated offenses. Barnes v. State, 25 Wis. (2d) 116, 130 N. W. (2d) 264; State v. Cuellar, 25 Conn. Supp. 229, 200 A. (2d) 729; Taglavore v. United States (9 Cir.) 291 F. (2d) 262; Johnson v. State, 92 Okla. Cr. 63, 220 P. (2d) 469; Holland v. State, 93 Okla. Cr. 180, 226 P. (2d) 448; Ellsworth v. State (Okla. Cr.) 295 P. (2d) 296; People v. Molarius, 146 Cal. App. (2d) 129, 303 P. (2d) 350; State v. Michaels, 60 Wash. (2d) 638, 374 P. (2d) 989; People v. Sapp, 43 Misc. (2d) 81, 249 N. Y. S. (2d) 1020; Hall, Kamisar, LaFave, & Israel, Modern Criminal Procedure (3 ed.) p. 286; Annotation, 10 A. L. R. (3d) 314.

A review of the authorities persuades us that the better view protects Fourth Amendment rights against "routine searches" arising out of ordinary traffic violations. The United States Court of Appeals for the Tenth Circuit dealt with this problem in United States v. Humphrey, 409 F. (2d) 1055. There, as here, the officers testified (409 F. [2d] 1057) that a search incident to an arrest for running a stop sign was based on "common and customary practice," stating, "We usually shake down almost everybody we stop if it's a man." Chief Judge Murrah, speaking for the court, condemned searches following minor traffic violations and held (409 F. [2d] 1058): "Such searches can only be justified in exceptional, on the spot circumstances which rise to the dignity of probable cause."

4. The conclusions we reach are not inconsistent with those of the Illinois court and others which have expressed a growing concern for the injuries and loss of life experienced by police officers in face-to-face confrontations with traffic offenders. People v. Tadlock, 59 Ill. App. (2d) 481, 208 N. E. (2d) 100. We are in accord with the views of the Maryland court in recognizing the "mounting cases where an officer is subjected to an attack by a motorist while investigating routine or minor traffic violations." Shelton v. State, 3 Md. App. 394, 399, 239 A. (2d) 610, 613. There is merit in the Maryland court's conclusion that

the validity of a search for weapons following a traffic arrest depends on whether the officer had reasonable grounds to believe a search was necessary for his own safety or to prevent an escape. Such cases are rare, however, and impose on the officer the burden of proving probable cause for conducting the search of defendant's person in all but the most serious traffic violations.

5.   We are not to be understood as holding that the police have no right, for their own protection, to search a person before placing him in a squad car if there is a valid reason for requiring him to enter the vehicle and it is not merely an excuse for an otherwise improper search. Examples of what may constitute probable cause for a search are circumstances where (a) a motorist is known by the police to be habitually armed or to have a record of assaultive behavior, or (b) he assumes a hostile and threatening attitude when stopped, or (c) the police, after stopping him, by cursory observation and without a search have valid reason to believe the motorist is engaged in the commission of a more serious crime.

There was no such evidence in the case before us, and the marijuana which was obtained by the search of defendant should therefore have been suppressed.

6.   There is some testimony, to be sure, that defendant himself scattered the marijuana in the car and on the ground. Ordinarily, this would not constitute an impermissible seizure of contraband in plain sight. However, the record rather clearly indicates that defendant's attempt to dispose of the evidence did not precede but followed efforts of the police to conduct an unlawful search. Finally, we do not overlook the fact that the police had observed defendant throw on the front seat of his automobile an object which later proved to be a gun. However, subsequently discovered facts cannot retroactively serve to validate a search which was otherwise unlawful.[4] Nevertheless, we do not suggest

---

[4] This is analogous to the rule that "[a] search is not made legal or reasonable by what it turns up, since under the established law it is

that the invalidity of the search would necessarily foreclose a prosecution for the offense, if any, of illegal possession of the gun. The judgment of conviction is accordingly reversed.

Reversed.

KELLY, JUSTICE (dissenting).

The majority opinion may be deciding an issue that has not been passed on by the Supreme Court of the United States and which has been the subject of many conflicting decisions by the courts of this country. The word "may" is used since the majority would reverse the lower court, not on the narrow issue of the scope of the search, but on the broad grounds that "[a]n arrest for a minor traffic violation does not justify a routine search of the motorist's person, either for weapons or contraband, unless the police have probable cause for believing he is armed or dangerous." Given a similar fact situation, the latter issue may be decided by the Supreme Court of the United States differently than the majority opinion and, at the very least, with guidelines that are not as restrictive as may be implied from the four corners of the foregoing decision.

The issue to be discussed hereafter may be stated with oversimplification because of the myriad of factors that enter into the cases with which the courts have been confronted all across the country. It will become obvious, too, that my appraisal of the evidence and the inferences to be drawn from it differs from that presented in the majority opinion. Likewise, my appraisal of the authorities bearing on the instant case and the weight and value to be given to them does not jibe with that of the majority opinion.

The majority opinion uses the words "minor traffic offense" whereas I do not believe that driving after suspension of a driver's license is a minor traffic offense. It was this suspected offense that motivated the officers to detain defendant, and both of the officers testified that one of their purposes in stopping

---

good or bad when it starts." People v. Anonymous, 56 Misc. (2d) 1022, 1029, 290 N. Y. S. (2d) 337, 344.

his car was that they felt or had a hunch that he was driving it and they knew his license to drive had been suspended. Nor would I classify the "search" in this case as "routine." There was no testimony that the officers routinely search persons and vehicles incident to an arrest for minor traffic offenses. The record discloses that they decided to detain defendant while a check was made via the police radio on the status of his driver's license. He did not have a regular driver's license on his person but had an instruction permit. Having decided to detain defendant for a period of from 5 to 15 minutes, the officers had as alternatives that he be permitted to go back to his car, stand outside, or be placed in the rear seat of the squad car. In view of defendant's suspicious actions in taking an object from his belt or pocket and throwing it on his car seat before walking toward the officers after he got out of his car, the last choice can hardly be considered inappropriate. Taking into account the time and place of the detention and the probable time involved in checking his license, it would seem to be good police practice to put defendant in the squad car where he could be whisked away in the event a crowd gathered and harassed or interfered with the officers while their investigation was under way. It might well be better to anticipate the possibility of such a confrontation and to avoid it. It is a matter of common knowledge that such confrontations have occurred and are difficult to handle. For instance, in United States v. Evans (7 Cir.) 385 F. (2d) 824, a car search was upheld which was made by police about 20 minutes after they had arrested the defendant and had moved his car to the Federal Building because a hostile crowd had gathered at the scene of the arrest.

In the case before us, once the decision was made to place defendant in the rear seat of the squad car, then it was "routine" police practice to search his person. However, this routine practice cannot be related to every arrest for a minor traffic violation because in the ordinary case there would be no reason for detention. It is reasonable to infer that having an armed person

in custody in the rear seat of a squad car would involve more danger to police officers than having him in front of them where his movements could be watched. Undoubtedly the police have adopted such practices as this because bitter experience acquired in a number of incidents has demonstrated that prudence and caution require such practices.

It is difficult to meaningfully cite cases to support either side of the issues in this case because it is difficult to find a common thread to follow on the differing facts and theories presented. Some courts have condemned searches incident to arrest for simple traffic offenses on the basis under their state law police officers may not take a person into custody for such an offense and may merely give the offender a traffic ticket. We are not confronted with this problem because under Minn. St. 629.34 police officers are permitted to make arrests and to take into custody persons committing misdemeanors in their presence.

Some courts have held searches and seizures incident to arrest for traffic offenses unconstitutional because the arrest was a pretext to enable the officer to search for narcotics or other contraband. But one of the courts that have solemnly pronounced searches incidental to arrests for a simple traffic offense unconstitutional held that a particular search and seizure was justified because the offender was suspected of being engaged in the policy rackets and acted suspiciously by attempting to avoid the police. Other courts have upheld searches and seizures with very little attendant circumstances to justify them above and beyond the arrest for a traffic offense. Some courts have held that arrests for traffic violations justify searches for weapons without any other compelling circumstances.

The basic issue, stated with oversimplification because of the differing factors involved in each case, is whether a person arrested for a traffic offense may constitutionally be searched incident to that arrest. In discussing cases on this issue, it is necessary to detail some of the circumstances that courts apparently felt were important in arriving at their decision. We have cited

car-search cases as well as person-search cases, as most of the courts have done, simply because the principles involved are so much the same.

In the instant case the arrest obviously was not pretextual in so far as a gun or narcotic violation is concerned, as the record shows that prior to stopping the car the police did not suspect that defendant would be carrying a gun or would have narcotics in his possession.

No decisions of the Supreme Court of the United States are directly in point, but it seems worthwhile to glean from the language of the cases on search and seizure what the thinking of that court may be on a similar case. The case of Preston v. United States, 376 U. S. 364, 84 S. Ct. 881, 11 L. ed. (2d) 777, should give us some insight to future decisions of that court relating to the problem presented to us. In that case, as summarized at 376 U. S. 364:

"Petitioner and two companions, who had been seated for several hours in a parked car, were arrested by the police for vagrancy, searched for weapons, and taken to the police station. The officers had the car towed to a garage, and soon thereafter they went themselves to the garage and for the first time searched the car. Various articles found in the car were later turned over to federal authorities and used as evidence in a trial in federal court resulting in petitioner's conviction of conspiracy to rob a federally insured bank. *Held:* The evidence obtained in the search of the car without a warrant was inadmissible because, being too remote in time or place to be treated as incidental to the arrest, it failed to meet the test of reasonableness under the Fourth Amendment."

The court in Preston did not directly nor impliedly indicate that the search would have been improper if it had not been too remote in place and time to be incidental to the arrest. After pointing out that what may be an unreasonable search of a house may be reasonable in the case of a motor car, the court went on to state:

"It is argued that the search and seizure was justified as incidental to a lawful arrest. *Unquestionably, when a person is lawfully arrested, the police have the right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons or for the fruits of or implements used to commit the crime.* Weeks v. United States, 232 U. S. 383, 392 (1914); Agnello v. United States, 269 U. S. 20, 30 (1925). This right to search and seize without a search warrant extends to things under the accused's immediate control, Carroll v. United States, *supra,* 267 U. S., at 158, and, to an extent depending on the circumstances of the case, to the place where he is arrested, Agnello v. United States, *supra,* 269 U. S., at 30; Marron v. United States, 275 U. S. 192, 199 (1927); United States v. Rabinowitz, 339 U. S. 56, 61-62 (1950). The rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime—things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control. But these justifications are absent where a search is remote in time or place from the arrest. Once an accused is under arrest and in custody, then a search made at another place, without a warrant, is simply not incident to the arrest. Agnello v. United States, *supra,* 269 U. S., at 31." (Italics supplied.) 376 U. S. 367, 84 S. Ct. 883, 11 L. ed. (2d) 780.

It should be noted that the United States Supreme Court, after stating that "[u]nquestionably when a person is lawfully arrested, the police have a right, without a search warrant, to make a contemporaneous search of the person of the accused for weapons," did not add the priviso that the police have probable cause for believing the person is armed or dangerous. That statement indicates that the police here had a right contemporaneous with the arrest to search defendant.

If we attempt to relate Preston to the case before this court, we find that in Preston there was an arrest for vagrancy, which

might be classified as a somewhat trivial and simple offense, comparable to an arrest for a minor traffic offense coupled with a reasonable and valid detention of the driver for a check on his driver's license, which to the knowledge of one of the officers had been previously suspended. As pointed out in the above quotation from Preston, the police had the right without a search warrant to make a contemporaneous search of the person of the accused for weapons and this right to search and seize without a search warrant extends to those things under the accused's immediate control under the literal language of Preston. Thus, the search of defendant's automobile certainly was valid and the search of his person for weapons was likewise valid.

The holding in Preston that the search of the car without a warrant failed to meet the test of reasonableness under the Fourth Amendment because it was too remote in time or place to have been incidental to the arrest has been distinguished and eroded in cases involving slightly different fact situations.

In Cooper v. California, 386 U. S. 58, 87 S. Ct. 788, 17 L. ed. (2d) 730, police without a search warrant took heroin from the glove compartment of petitioner's impounded car a week after he had been arrested for a narcotics violation. In affirming the conviction a 5-to-4 majority of the court pointed out that Preston was arrested for vagrancy and his car was taken to the station simply because the officers did not wish to leave it on the street. In Cooper the officer impounded petitioner's car pursuant to state law requiring them to do so when making an arrest for a narcotics violation and to keep it until forfeiture proceedings were concluded. The court pointed out it would be unreasonable to hold that the police, being required to retain the car in their garage pending forfeiture proceedings, had no right to search it. The dissenting opinion asserted that the case was on all fours with Preston, for in each case the search was of a car validly held by officers.

A further erosion of the holding in Preston occurred in Harris v. United States, 390 U. S. 234, 88 S. Ct. 992, 19 L. ed. (2d) 1067.

In that case, as the petitioner was entering his car, he was arrested for robbery. The vehicle was towed to the police station because it had been seen at the site of the robbery. Police regulations required that an officer who takes an impounded vehicle in charge must search it thoroughly and remove all valuables from it, so the arresting officer searched the car without a warrant. When he opened the car door, he saw an automobile registration card in the name of the robbery victim in the car. The court in a per curiam opinion held the card was properly admitted into evidence. The decision was based on the theory that the discovery of the card was not the result of a search of the car but of a measure taken to protect the car while it was in police custody. The court pointed out that the registration card with the name of the robbery victim on it was plainly visible once the door of the car was opened.

In Dyke v. Taylor Implement Mfg. Co. 391 U. S. 216, 88 S. Ct. 1472, 20 L. ed. (2d) 538, the court seemingly saved the last vestige of Preston in a very narrow situation, although how much was saved may be questioned after its decision in Chambers v. Maroney, 399 U. S. 42, 90 S. Ct. 1975, 26 L. ed. (2d) 419. In Dyke petitioners were arrested for reckless driving and while they were in custody inside the courthouse, their car parked outside in the street was searched. The court distinguished Cooper v. California, *supra*, and stated:

"* * * In the instant case there is no indication that the police had purported to impound or to hold the car, that they were authorized by any state law to do so, or that their search of the car was intended to implement the purposes of such custody." 391 U. S. 221, 88 S. Ct. 1475, 20 L. ed. (2d) 543.

The court in Dyke did make a statement which has some bearing on the instant case:

"* * * While the record is not entirely clear, petitioners appear to have been arrested for reckless driving. Whether or not a car may constitutionally be searched 'incident' to arrest for

a traffic offense, the search here did not take place until petitioners were in custody inside the courthouse and the car was parked on the street outside. Preston v. United States, 376 U. S. 364 (1964), holds that under such circumstances a search is 'too remote in time or place to [be] incidental to the arrest * * *.' " 391 U. S. 220, 88 S. Ct. 1475, 20 L. ed. (2d) 543.

It would seem that what might be learned from Preston and Dyke is that the Supreme Court has not seen fit to condemn searches incident to arrest for minor offenses such as vagrancy, which can certainly be equated with the offenses in the instant case. We note, too, that the Supreme Court of the United States did not use a broad brush in these cases but decided them on the particular facts and circumstances in each case. Finally, it might be pointed out that after Preston, decided in 1964, rulings of that court became, if anything, less restrictive as shown by Cooper and Harris. If there is any doubt about this, one need only to look at Chambers v. Maroney, *supra,* commented on as follows in Note, 55 Minn. L. Rev. 1011, 1026:

"'* * * The issue in Chambers concerned the admissibility of evidence seized from a car in which the defendant was riding at the time of the arrest. After the defendant was arrested the car was taken to a police station and there thoroughly searched without a warrant. The Court, citing Preston, held that the search could not be justified as incident to arrest, but could be justified as an exception to the warrant requirement, established in Carroll v. United States, [267 U. S. 132, 45 S. Ct. 280, 69 L. ed. 543], by which it is possible for a police officer to search a car if he has probable cause to believe that there is contraband present. No arrest is necessary. The Court added:

" 'Carroll * * * [does not] require or suggest that in every *conceivable circumstance* the search of an auto even with probable cause may be made without a * * * warrant. * * * But * * * the opportunity to search is fleeting since a car is readily movable. Where this is true, as in Carroll and the case before us

now, if an effective search is to be made at any time, either the search must be made immediately without a warrant or the car itself must be seized and held without a warrant for whatever period is necessary to obtain a warrant for the search.

" '* * * Only in exigent circumstances will the judgment of the police as to probable cause serve as a sufficient authorization for a search.'
despite these cautionary words, if a search can be made in the instant case where the car was in police custody and thus not movable, the occupants were in jail and could not escape or destroy the evidence and the evidence was not contraband, when can a search not be made?"

Sibron v. New York, 392 U. S. 40, 88 S. Ct. 1889, 20 L. ed. (2d) 917, cited by the majority, cannot be equated with the instant case because in Sibron the police officer was not in fact looking for weapons but for narcotics and the search was not incident to an arrest. Terry v. Ohio, 392 U. S. 1, 88 S. Ct. 1868, 20 L. ed. (2d) 889, decided the same day as Sibron, upheld the legality of a detention and search of the defendants' persons for weapons by a policeman when there was no probable cause for an arrest. The court pointed out:

"* * * It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U. S. 16, 88 S. Ct. 1877, 20 L. ed. (2d) 903.

Certainly it was appropriate for the officer in the instant case to detain or seize defendant for the purpose of checking on his driver's license even if we did not consider the traffic offenses. In Terry the police officer involved had no reason to believe that he had any probable cause for an arrest. He was merely suspicious of the actions of Terry and a companion in alternately peering into a store window on a number of occasions and then conferring afterwards with a third party. The officer felt that the

trio might be planning to rob the store and that they might be armed and dangerous.[1]

---

[1] In Terry, the court said (392 U. S. 15, 88 S. Ct. 1877, 20 L. ed. [2d] 902):

"* * * [W]e turn our attention to the quite narrow question posed by the facts before us: whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons unless there is probable cause for an arrest. Given the narrowness of this question, we have no occasion to canvass in detail the constitutional limitations upon the scope of a policeman's power when he confronts a citizen without probable cause to arrest him.

"* * * It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime—'arrests' in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. And it is nothing less than sheer torture of the English language to suggest that a careful exploration of the outer surfaces of a person's clothing all over his or her body in an attempt to find weapons is not a 'search.' * * *

"* * * This Court has held in the past that a search which is reasonable at its inception may violate the Fourth Amendment by virtue of its intolerable intensity and scope. Kremen v. United States, 353 U. S. 346 (1957); Go-Bart Importing Co. v. United States, 282 U. S. 344, 356-358 (1931); see United States v. Di Re, 332 U. S. 581, 586-587 (1948). The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible. * * *

* * * * *

"* * * [I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate? Cf. Carroll v. United States, 267 U. S. 132 (1925); Beck v. Ohio, 379 U. S. 89, 96-97 (1964). Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. See, e. g., Beck v. Ohio, supra; Rios v. United States, 364 U. S. 253 (1960); Henry v. United States, 361 U. S. 98 (1959). And simple ' "good faith on the part of the arresting officer is not enough." * * * If subjective good faith alone were the test, the protections of the Fourth Amendment would

It is interesting to note that when the officer stopped Terry and the others, he did not draw a gun. In the instant case, one of the officers was asked if he was particularly frightened and

---

evaporate, and the people would be "secure in their persons, houses, papers, and effects," only in the discretion of the police.' Beck v. Ohio, *supra*, at 97.

"Applying these principles to this case, we consider first the nature and extent of the governmental interests involved. One general interest is of course that of effective crime prevention and detection; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. It was this legitimate investigative function Officer McFadden was discharging when he decided to approach petitioner and his companions. He had observed Terry, Chilton, and Katz go through a series of acts, each of them perhaps innocent in itself, but which taken together warranted further investigation. There is nothing unusual in two men standing together on a street corner, perhaps waiting for someone. Nor is there anything suspicious about people in such circumstances strolling up and down the street, singly or in pairs. Store windows, moreover, are made to be looked in. But the story is quite different where, as here, two men hover about a street corner for an extended period of time, at the end of which it becomes apparent that they are not waiting for anyone or anything; where these men pace alternately along an identical route, pausing to stare in the same store window roughly 24 times; where each completion of this route is followed immediately by a conference between the two men on the corner; where they are joined in one of these conferences by a third man who leaves swiftly; and where the two men finally follow the third and rejoin him a couple of blocks away. It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood to have failed to investigate this behavior further.

"* * * Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties. American criminals have a long tradition of armed violence, and every year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives."

he replied in the negative. The choice of words was not appropriate because an affirmative answer would imply that as a man and a police officer he was afraid. This evidence therefore should not give rise to any inference that defendant under all these circumstances might not be armed and that prudence would not dictate that he be searched before he was placed in the squad car. As pointed out twice by Officer Patsy, he searched defendant before placing him in the rear of the squad car for the protection of the police officers.

In Terry, Mr. Chief Justice Warren pointed out that 57 law enforcement officers were killed in the line of duty in 1966 and that in the same year there were 23,851 assaults on such officers, 9,113 resulting in injuries. 392 U. S. 24, note 21, 88 S. Ct. 1881, 20 L. ed. (2d) 907. The Federal Bureau of Investigation—Uniform Crime Reports for the United States for the year 1969 show that there were 86 officers killed in line of duty, 35,202 assaulted, and 11,949 injured. We are informed that the reports for 1970 will show that there were approximately 100 police officers killed in the line of duty. In the light of these statistics, it behooves police officers in confrontations to be more prudent and cautious than ever before.

A minute examination of selective cases appears to be the only practical way of presenting not only the pronounced reasoning of various other courts, but perhaps an insight to the theories behind the reasoning.

My experience in researching the issue before us is articulated in State v. Coles, 48 Ohio O. (2d) 309, 311, 249 N. E. (2d) 553, 556, as follows:

"Arduous research and minute examination conclusively admits the confusion surrounding the case-by-case development of the doctrine of search of motor vehicles without warrant incident to a valid arrest for violation of traffic laws."

Coles was stopped by police and arrested because the brake lights on his vehicle were not functioning and it did not have a light which would illuminate the rear license plate. The police

had had prior confrontations with Coles in which he had been armed and had been driving the same Cadillac car they were stopping. The officers alighted and approached the Cadillac. Coles got out of the Cadillac while they were approaching. They then recognized Coles. The officers frisked him, searched his car, and found a gun which was not in plain sight but was under the left front seat. It is interesting to note that the officers at no time drew their weapons although Coles was belligerent and on prior occasion one of the police officers had found it necessary to handcuff him. I assume that most officers hesitate to draw weapons until danger from an armed attack is actually known, possibly because of the inherent danger of handguns and the hue and cry when an unarmed person is accidentally shot by police. Surprisingly enough, Coles contended that one of the police officers could have held him at bay by drawing his revolver or by handcuffing him and that either one of these procedures would have obviated the necessity of their searching the car for their protection. The court held the search valid and stated inter alia (48 Ohio O. [2d] 312, 249 N. E. [2d] 557) :

"In coming to grips with the determinable issue the Court is compelled to recognize that in these days of high crime rates, effective law enforcement demands that the evil doer in our society who desires to destroy life and property should be swiftly brought to justice and hence a more absolute principle should be furnished the police. But in the area of traffic violations, as in all other areas, a balance between effective law enforcement and the protection of constitutional rights to which all citizens are entitled must be made. * * *

\* \* \* \* \*

"Research reveals that some legal scholars and some judges advocate and hold that a lawful arrest for a minor traffic offense, without more, fails to produce a predicate for search of the person, much less for search of the vehicle. The fear has been expressed that no respectable citizen is able to drive without some possibility and, in fact, probability, of violating a traffic

law. In order to protect this respectable citizen from the harassment and embarrassment of searches by the police, it is contended that the mere fact of arrest should not authorize a search. Such an argument evades the issue. The search of an innocent person lawfully arrested on charges other than a traffic offense also results in embarrassment and harassment. Yet there is no hue and cry resounding over the land in this regard. Those who oppose searches in this area claim that the reasons advanced for permitting searches is the quest for certainty. The issue is again evaded.

"The reason for permitting the search is to protect the officer. It is not untenable that the respectable citizen who finds himself under lawful arrest may panic or attempt to escape or perhaps use a weapon which he might have lawfully in his possession to harm the officer. The point is that no reason has been advanced why the officer should take the risk. Moreover must the officer indulge in presumptions that the arrestee is respectable and may not have good reason to avoid a prolonged encounter with the police. The arrestee may be a wanted criminal or someone who has committed an offense which is in fact the case with respect to those who are defendants in the reported cases. Invariably, all the decided cases involve either conviction based upon the discovery of contraband or other evidence or a motion to suppress. This is not to suggest that the search should justify the arrest, because in the cases involved the arrest is valid and the only question is whether or not the search should be permitted. The fact that weapons and contraband are in the possession of those arrested for traffic violations should have some bearing on whether there is any public policy to be served by limiting the right to search in such instances. This is particularly important in the case where weapons are found. If the fact of arrest is never sufficient to justify a search incident to a traffic violation unless there are additional circumstances apparent to the policeman to justify the search, who would be willing to tell the widow of the dead police officer that was killed because a narrow view

of the Constitution deprived him of one of the means he has traditionally had for the purpose of protecting himself?"

In Neely v. State, 240 Ind. 362, 363, 164 N. E. (2d) 110, the court stated:

"We do not believe appellant's position in this respect is meritorious as the search of the car appears to have been made reasonably incident to the lawful arrest of appellant for running a stop sign. It is well settled that a search reasonably incident to a lawful arrest can properly be made although accomplished without a search warrant. See: Berry v. State (1926), 197 Ind. 212, 150 N. E. 315."

The necessity of factual details and a discussion of the court's opinion becomes obvious when various cases are examined in some depth. A good example is Nunez v. United States (5 Cir.) 370 F. (2d) 538, 539, where the court stated the following:

"* * * On the night of March 13, 1964, Nunez and Linda Jean Hendley were riding in an automobile driven by Peter James Schwander when two detectives of the New Orleans Police Department observed the vehicle being driven in a reckless manner. The officers pursued the vehicle for several blocks whereupon Schwander parked the car and he and Hendley alighted. The officers approached the vehicle and found Nunez lying on the front seat and ordered him to get out of the car. The officers then observed a sawed-off shotgun in its case lying near the driver's side of the car, partially beneath the front seat. A search of Nunez disclosed shotgun shells of the same gauge as the weapon. Thereafter, Nunez and Schwander were tried and convicted of the possession and improper transfer of the above described weapon and Nunez appeals from this conviction.

"It is contended by the appellant that the conviction is unlawful for the following reasons: (a) there was an unlawful search and seizure; * * *

"* * * We are unable to find any merit in the appellant's contention as to the unlawful search and seizure. It was incident to

a valid traffic arrest and there was ample evidence to support the conclusion that the weapon involved was clearly visible to the officers without a detailed search of the automobile."

If we accept the proposition that an officer may not, incident to an arrest for a traffic offense, search a car or person unless the officer does so for his own protection, presumably the officer in Nunez should have given Schwander a ticket and had no business going back to the car to look in it. Schwander got out of the car, probably so that the officers would have no reason for approaching it, which undoubtedly is the reason that defendant in the instant case alighted from the car and walked back to the officers. Nor was there any reason for ordering Nunez out of the car if the police may not make searches incident to traffic arrests.

There is language in Mendoza v. United States (5 Cir.) 365 F. (2d) 268, 274, which tends to throw some light on the issue before us, including the scope of the search:

"We look to Texas law to determine the validity of the arrest. Collins v. United States, 5 Cir. 1961, 289 F. 2d 129, 131. In Texas the seizure of narcotics has repeatedly been held legal where officers were authorized to arrest an accused for traffic violations. Palacio v. State, 1957, 164 Tex. Cr. R. 400, 299 S. W. 2d 944; Brown v. State, 1953, 159 Tex. Cr. R. 306, 263 S. W. 2d 261. See Jackson v. United States, 5 Cir. 1965, 352 F. 2d 490; McNeely v. United States, 8 Cir. 1965, 353 F. 2d 913, 918; United States v. Rodgers, E. D. Mo. 1965, 246 F. Supp. 405.

"The trial record shows a lawful arrest for several traffic violations at the time Mendoza was examined for needle marks. The arresting officer testified that he followed Mendoza's automobile because it 'made a reckless turn into a side street.' Mendoza attempted to escape apprehension by speeding up one street and over another. The car had the 'mark of fleeing men * * * acting furtively.' Henry v. United States, 1959, 361 U. S. 98, 103, 80 S. Ct. 168, 172, 4 L. Ed. 2d 134, 139. Mendoza concedes that [the officer] accused him of not having a proper driver's license.

Accordingly, the officer had probable cause to arrest Mendoza both for making an improper turn and for failing to display a proper driver's license. For each of these offenses, Texas officers have general authority to arrest without a warrant. They have a choice of taking the prisoner before a magistrate, issuing a written notice to appear, or invoking any other appropriate procedure of arrest. Tex. Civ. Stat. Art. 6701d, §§ 147-48, 150, 153 (1960). In this case, the Freer officers chose to take Mendoza promptly to City Hall for a reasonable search of his person while he was still under arrest for traffic violations. Shortly thereafter, the officers learned of San Antonio's outstanding warrants for his arrest on armed robbery charges.

"The search of Mendoza did not exceed the scope of the arrest. Generally speaking, the Government has a right 'always recognized under English and American law, to search the person of the accused when legally arrested, to discover and seize the fruits or evidences of crime.' Weeks v. United States, 1914, 232 U. S. 383, 392, 34 S. Ct. 341, 344, 58 L. Ed. 652.''

In Mendoza the language used would certainly support the arrest, search, and seizure in the case before this court. The search of defendant before placing him in the squad car can hardly be said to be more drastic action than taking him to the police station for a search. It should be noted that the court in Nunez did not find it necessary to even comment on any danger to the officers.

United States v. Owens (7 Cir.) 346 F. (2d) 329, certiorari denied, 382 U. S. 878, 86 S. Ct. 163, 15 L. ed. (2d) 119, was a non-pretext case in which defendant Howell was arrested for a traffic violation of speeding. Under Pennsylvania statutes concerning the validity of the search made of a car being driven by Howell, Judge Kiley observed (346 F. [2d] 331):

"Howell was driving with Owens and one Hightower in a new Cadillac convertible on the Pennsylvania Turnpike when he was arrested for speeding. An on-the-spot interrogation disclosed the suspicious circumstance that the car was registered in the

name of Lily Starkey, whom Howell said he did not know and from whom neither Owens nor Howell could show permission to drive the car. The Pennsylvania officer, suspecting that the car was stolen, questioned Owens about the contents of the trunk, which Owens opened, revealing three suitcases. Owens disclaimed ownership of one of the suitcases, which was unlocked, and when opened by the officer contained, in open view, a crude hypodermic needle of a type used by addicts. Searching further in the suitcase the officer found a burnt spoon with a bent handle, also an addict's tool, and a loaded revolver. A search of Howell at the police station disclosed in his shoe a package of nearly pure heroin.

"It is clear from the facts in the record that the arrest for speeding was not 'a mere excuse to search' for narcotics as in Taglavore v. United States, 291 F. 2d 262, 265 (9th Cir. 1961), and that the arrest was valid under Pennsylvania law, which controls that question. United States v. Di Re, 332 U. S. 581, 68 S. Ct. 222, 92 L. Ed. 210 (1948); United States v. Viale, 312 F. 2d 595, 599 (2d Cir.) cert. denied 373 U. S. 903, 83 S. Ct. 1291, 10 L. Ed. 2d 199 (1963). The surrounding circumstances justified the arresting officer in suspecting that he was dealing with a situation more serious than routine speeding and he had reasonable grounds for believing that the car might be stolen. There is nothing to indicate that the officer suspected the presence of any narcotics or other violation until the suitcase was opened, disclosing the needle. Considering the situation which faced the officer, his attempts to determine whether the car was stolen were not unreasonable or violative of the Fourth Amendment, and the evidence which was turned up was not the fruit of any 'poisonous tree.' "

As to Howell, the question might be asked—why should the police have done any more than issue a ticket for speeding? The court suggests that the surrounding circumstances justified the arresting officer in suspecting that he was dealing with a situa-

tion more serious than routine speeding. The "surrounding circumstances" were disclosed by the police in interrogating the occupants of the car about the registered owner. In the instant case, the suspicious circumstances were created by defendant himself, that is, alighting from the car, throwing an object on the seat of the car, walking back towards the officers, and grabbing the bag of marijuana out of his pocket. The court in Owens made much of the fact that the arrest for speeding was not a mere excuse to search. In Owens it might be argued that the scope of the search went beyond any need for the protection of the officers. The police not only searched the car trunk, but suitcases in the trunk, all without any adverse comment from the court.

In Barnes v. State, 25 Wis. (2d) 116, 125, 130 N. W. (2d) 264, 268, the court stated:

"We are not persuaded that where a traffic offender actually is arrested, as distinguished from being handed a summons to appear in court at some future time, that it is unreasonable for the arresting officer to search his person for weapons."

The court then pointed out that all searches by police are subject to reasonableness. Barnes was stopped for a brake-light violation, was patted down, and then a flashlight was beamed in his overcoat pocket, disclosing a small quantity of green weed particles later identified as marijuana and a package of gummed cigarette papers. The court stated that the use of the flashlight to uncover marijuana weed fragments transcended the bounds of reasonableness. The court also stated (25 Wis. [2d] 126, 130 N. W. [2d] 269):

"* * * [W]e deem it advisable to add the observation that the type of search here conducted raises a strong suspicion that the original arrest for the minor traffic offense committed was but a pretext to search defendant for narcotics."

In Lane v. State (Tex. Cr. App.) 424 S. W. (2d) 925, certiorari denied, 392 U. S. 929, 88 S. Ct. 2270, 20 L. ed. (2d) 1387, a police

officer stopped Lane for speeding, searched his vehicle, and found a pistol in the glove compartment and then searched Lane. That court sustained the search and seizure and stated (424 S. W [2d] 928):

"The right to search as an incident to a lawful arrest is given to all peace officers, not just to those who are afraid or are in actual danger. It was not incumbent upon the state to prove that the officer was afraid or that he was in danger, or that at the time of the arrest and search the officer knew that even though appellant might have a pistol within reach he would not use it to assault an officer or to effect his escape."

In Adair v. State (Tex. Cr. App.) 427 S. W. (2d) 67, a search of defendant's automobile by a police officer after defendant's arrest for a traffic violation (failure to signal in changing lanes) and after defendant kept getting in front of the officer as he walked towards the automobile, thereby arousing the officer's suspicion that defendant was trying to hide something, was not unreasonable. A pistol recovered from underneath the armrest in the middle of the front seat was therefore admissible in a prosecution for unlawfully carrying a pistol.

To the same effect, see State v. Cherry (Tex. Civ. App.) 387 S. W. (2d) 149, 153, where the court stated:

"Cherry was arrested for speeding after a chase at 100 miles per hour in a zone where the speed limit was 35 miles per hour. This gave the officers the right without a warrant to search the automobile he was driving. Brown v. State, 159 Tex. Cr. R. 306, 263 S. W. 2d 261; Soileau v. State, 156 Tex. Cr. R. 544, 244 S. W. 2d 224; Richardson v. State, 163 Tex. Cr. R. 585, 294 S. W. 2d 844. 'The arrest being lawful, the search of the car was also lawful.' Minor v. State, Tex. Cr. App., 219 S. W. 2d 467, 470."

In People v. Brown, 272 Cal. App. (2d) 448, 77 Cal. Rptr. 438, a search made incident to arrest for operating a vehicle with a broken taillight revealed marijuana under the front seat of the car. The search was held legal where (1) the automobile was

stopped at night in a rural area; (2) the driver, aware of the police car, made a movement consistent with hiding something under the front seat while bringing his car to a stop; (3) the driver brought the car to a stop somewhat beyond the area where the officers intended to stop it, and (4) the driver stepped out and met officers at the rear of the car.

The case of Amador-Gonzalez v. United States (5 Cir.) 391 F. (2d) 308, cited and quoted from in the majority opinion, is most interesting because that court refused to decide the issue presented in the instant case. Judge Wisdom wrote the opinion and Judges Coleman and Godbold in separate opinions concurred in the result. Both Judge Coleman and Judge Godbold refused to adopt Judge Wisdom's view that all searches incident to a bona fide arrest for a traffic violation absent special circumstances were invalid. Judge Coleman stated (391 F. [2d] 319):

"* * * In my view, however, the decisive point is that as to traffic violations the arrest in this case was pretextual. We do not, therefore, reach, and it is unnecessary to express an opinion on, the validity or invalidity of searches executed when an officer does make a bona fide arrest for a traffic violation committed in his presence."

Judge Godbold pointed out there was probable cause for the traffic arrest, but that the acknowledged motive for the arrest was to search for narcotics and that such a search is invalid. He then stated (391 F. [2d] 319):

"Legality of a search conducted after a traffic arrest which has not been made for an improper motive is not involved in this litigation and not hammered out as an issue between the parties. Justice Brandeis' statement of rules of policy for passing on constitutional questions is still valid. 'The Court will not "anticipate a question of constitutional law in advance of the necessity of deciding it." * * *'

"* * * Search after traffic arrest is in a sensitive, developing

and difficult area of the law, and the authorities and the under-lying considerations are in conflict."

The cases from Illinois deserve some attention because, al-though from some of the language in People v. Watkins, 19 Ill. (2d) 11, 166 N. E. (2d) 433, cited in the majority opinion, it could be concluded that the Illinois Supreme Court would hold all searches incident to a traffic arrest invalid, that court has found grounds for sustaining searches which might make one wonder whether they apply the rule with fervor or look for some way of getting around the rule. In Watkins the arrest for the traffic violation had to be pretextual although it was not specif-ically characterized as such by the court. The following comment appears in Hall, Kamisar, LaFave, & Israel, Modern Criminal Procedure (3 ed.) p. 288:

"In contrast to Amador-Gonzalez, a number of courts have up-held searches incident to traffic arrests notwithstanding some evidence the police were acting for other motives. For example in People v. Watkins, 19 Ill. 2d 11, 166 N. E. 2d 433 (1960), of-ficers assigned to the *gambling* squad had followed the defend-ant for some time, apparently because they believed him to be a courier for the 'policy' racket. The defendant parked too close to a crosswalk ('the kind of minor offense,' the court noted, 'that ordinarily results in a "parking ticket" hung on the handle of the door of the car, telling the offender that it is not necessary to appear in court if he mails in the amount of his fine') and entered a building. The vehicle remained illegally parked for 20 minutes, but the officers made no attempt to ticket it. The de-fendant was arrested for the traffic offense only after he exited from the building, saw the police, and then ran back into the building, and in a search incident to that arrest, policy slips were found on his person. The court rejected the state's contention that a search of the person may always be made incident to a traffic arrest, but then proceeded to uphold the search on the precise ground that it was 'reasonable for the arresting officers

to assume that they were dealing with a situation more serious than a routine parking violation.' "

In Watkins it was obvious that the search was for policy tickets, not weapons, and that the search had nothing to do with danger to the police. It is important that some of the language in Watkins be construed in the context of this statement by the court (19 Ill. [2d] 18, 166 N. E. [2d] 437):

"A search incident to an arrest is authorized when it is reasonably necessary to protect the arresting officer from attack, to prevent the prisoner from escaping, or to discover fruits of a crime. But the violation involved in this case was parking too close to a crosswalk,—the kind of minor traffic offense that ordinarily results in a 'parking ticket' hung on the handle of the door of the car, telling the offender that it is not necessary to appear in court if he mails in the amount of his fine. Such an offense does not, in itself, raise the kind of inferences which justify searches in other cases. *Some traffic violations would justify a search. The total absence of license plates, for example, as in People v. Berry, 17 Ill. 2d 247, could reasonably suggest a serious violation of the law, as could an obscured license plate upon a car being driven in the early morning hours, as in People v. Esposito, 18 Ill. 2d 104.* But when no more is shown than that a car was parked too close to a crosswalk or too far from a curb, the constitution does not permit a policeman to search the driver." (Italics supplied.)

If we apply the statements of our own court in State v. Clifford, 273 Minn. 249, 141 N. W. (2d) 124, and State v. Harris, 265 Minn. 260, 121 N. W. (2d) 327, certiorari denied, 375 U. S. 867, 84 S. Ct. 141, 11 L. ed. (2d) 94, both cited in the majority opinion, to the facts in the instant case as I view them, we should have no difficulty in affirming the court below. Harris actually did not involve a search incident to a traffic arrest, but the court did observe: "Police officers may not ordinarily make searches upon apprehending motorists for simple traffic violations

* * *." 265 Minn. 268, 121 N. W. (2d) 333. In Clifford, this court made a somewhat similar observation, quoted in the majority opinion, and used the phrase, "relatively trivial traffic violation." The traffic offense involved in Clifford was changing lanes without signaling. The court characterized the arrest as a "transparent pretext" and stated: "[The police] had no authority to search the defendant's car * * * incident to an arrest for changing lanes without signaling." 273 Minn. 254, 141 N. W. (2d) 127. The court did hold the search valid on the theory that the police had probable cause based on their knowledge of a number of circumstances to apprehend Clifford for larceny and in the process to seize the evidence found in his car.

The dicta in Harris and in Clifford are far from fatal to an affirmance in the instant case because this case does not present the "context of a relatively trivial traffic violation" to which such dicta might apply.

The testimony here is that according to Officer Patsy, defendant was wearing a "pea coat," a "wool type coat," and that he was searched before Officer Burke had found the loaded .45 automatic on the front seat of defendant's car and just prior to his being placed in the squad car. Officer Patsy testified in part:

"Q. And Curtis [defendant] was then taken to your squad where he was searched?

"A. Yes, sir.

"Q. For what purpose, sir?

"A. For our protection to see if there were any weapons on his person.

* * * * *

"Q. All right. And, as a matter of course, when people are placed under arrest you frisk to see if there is something that might be suspicious such as a weapon that this person might have on him?

"A. We check everyone that gets into our squad car, yes.

* * * * *

"Q. What happened next?

"A.   As I started to search him I first felt the outside of his pockets and then I went to go inside.

"Q.   What did you feel on the outside of his pocket?

"A.   I felt some objects in the pocket.

"Q.   What did they feel like, sir?

"A.   I don't recall, to be truthful with you.

"Q.   Feel like a gun?

"A.   No, sir.

"Q.   Feel like a knife?

"A.   I don't—I couldn't tell because there was—felt like more than one.

"Q.   Feel like gloves?

"A.   I couldn't tell what was in there by the outside.

\* \* \* \* \*

"Q.   Anything that led you to believe that there was anything of any danger to you whatsoever in that pocket?

"A.   I didn't know until I checked.

"Q.   Were you at all suspicious of anything in the pocket?

"A.   Yes, I was.

"Q.   Of what?

"A.   Well, of Mr. Curtis' actions when he got out of the car and I felt—I had to check him before I put him in the squad car.

"Q.   Okay.

"A.   For my own protection.

"Q.   \* \* \* In other words, the fact that he had thrown something out of his pocket, or out of his belt, or pocket, when he left the car?

"A.   Yes.

"Q.   And any other action that he had done that made you suspicious?

"A.   No.

"Q.   Nothing about the frisking of him that made you suspicious?

"A.   Yes.

"Q. What was that, just the fact there was something in the pocket?

"A. As I reached in his pocket, Mr. Curtis became excited. He grabbed this package out of his jacket pocket and started dumping the contents all on the ground and inside the squad car at which time I grabbed the package away from him.

\* \* \* \* \*

"Q. What was the purpose at the time you told Mr. Curtis to get in the squad—what was the purpose at that time of putting him in the squad? You say because of traffic, what do you mean by that?

"A. Well, as I said, I believed his license was under suspension.

"Q. Yes.

"A. He had made a turn without a signal. He had defective equipment on his car, and also the fact that when he got out of the car he stopped and pulled something from his person and threw it back in the car, so we didn't know exactly what Mr. Curtis was up to at that time."

Officer Burke testified in part:

"Q. And if you were to place somebody into custody, you would place him in the back seat, I assume?

"A. Yes, we do.

"Q. And as a matter of course, if you are going to place somebody in that back seat you are going to search before you do, or at least frisk him?

"A. Yes, we are.

"Q. That's a matter of course, is it not?

"A. Yes, sir.

"Q. Usually you will feel down and see whether there is anything suspicious as a weapon or anything might be dangerous to you, is that right?

"A. Yes, we do."

Officer Burke testified also that he saw Officer Patsy remove the package of marijuana from defendant's pocket. While this

testimony varies from the testimony of Officer Patsy that defendant removed the bag from his own pocket, Officer Burke may have been mistaken as he was standing to the rear of Officer Patsy. Furthermore, he testified that he saw defendant blow on the back seat of the squad car and that he joined with Officer Patsy in collecting greenish particles from the squad car's interior. This testimony is consistent with Officer Patsy's statement that defendant took the package out of his pocket and started dumping the contents.

The search should be sustained under the circumstances in this case on the ground that Officer Patsy could not tell whether defendant had a pistol or knife in his pocket. In fact, he couldn't tell from the outside if there was anything hard in the pocket. We don't know how thick or stiff the material of the pea coat was or what could have been hidden behind the material, but Officer Patsy's testimony was that he couldn't tell what was inside the pocket from the outside. His testimony was evidently accepted by the court below. Obviously, if defendant removed the marijuana himself, no search, as such, produced it and where a suspect has made evidence available to the officer, no constitutional questions are involved. Ironically, if the officers had not searched defendant, the marijuana would no doubt have been discovered at the police station, or on the way thereto if defendant had started dumping it and was observed doing so by the officers.

It would seem to me that the case below should be affirmed without attempting to establish any particular rule for the future because, as Judge Godbold stated in Amador-Gonzalez:

"* * * Search after a traffic arrest is in a sensitive, developing and difficult area of the law, and the authorities and the underlying considerations are in conflict." 391 F. (2d) 319.

It may well be that in the light of ever-increasing assaults on law-enforcement officers, as pointed out in Terry, all searches incident to a bona fide arrest for a traffic violation will be upheld by the Supreme Court of the United States. If not, and at

the very least, an objective standard similar to the one proposed in Terry may be adopted. That standard would be based upon prudence and caution rather than on probable cause to believe the individual suspect was armed or dangerous. In Terry, Mr. Chief Justice Warren stated:

"* * * [I]t is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" 392 U. S. 21, 88 S. Ct. 1880, 20 L. ed. (2d) 906.

I found nothing in the transcript to indicate the officers were anything but courteous to defendant. Their actions were appropriate in view of his actions and their knowledge of the suspension of his driver's license. In the light of the number of assaults and killings of law-enforcement officers, prudence and caution would dictate that defendant be searched before being placed in the squad car.

ODDEN, JUSTICE (dissenting).

I join in Mr. Justice Kelly's dissenting opinion.