582 N.W.2d 886 (1998)
STATE of Minnesota, Respondent,
v.
Beverly Ann VARNADO, petitioner, Appellant.
No. C7-97-960.
Supreme Court of Minnesota.
August 6, 1998.
*888 Kevin A. Lund, Rochester, for Appellant.
Hubert H. Humphrey, III, Attorney General, State of Minnesota, Raymond F. Schmitz, Olmsted County Attorney by David S. Voigt, Assistant County Attorney, Rochester, for Respondent.
Heard, considered, and decided by the court en banc.

OPINION
TOMLJANOVICH, Justice.
We must determine whether one of the well-established exceptions to the Fourth Amendment's search warrant requirement applies to the frisk that occurred in this case. Two officers stopped respondent Beverly Ann Varnado for driving a car with a cracked windshield as she pulled into a parking lot of an apartment complex that is known for drug trafficking. Varnado was alone, cooperative, and did not engage in behavior evoking suspicion that she may be armed or engaged in criminal activity. Nonetheless, after discovering that Varnado did not have her driver's license with her, one of the officers asked her to sit in the squad car and frisked her before she could get into the squad. We hold that under these facts, no exception to the warrant requirement applies and therefore the frisk was unlawful.
On November 1, 1996, Police Officer Mark Nunemacher and Reserve Officer Scott Oesterlin were in a marked squad car patrolling near the Eastridge Estates apartment complex (Eastridge) in Rochester. Both officers were assigned to that area due to suspected drug trafficking at Eastridge. According to Nunemacher, Eastridge is in a high-crime area known for drug trafficking, violence, and weapons. At about 9:30 p.m., Nunemacher and Oesterlin observed a car with a shattered windshield pull into the Eastridge parking lot. Nunemacher recognized the car as belonging to a woman whom he knew did not have a valid driver's license and whom he suspected sold drugs out of an apartment at Eastridge. Without making any evasive actions, the driver of the car, who was alone, parked in the space normally used by the woman who owned the car. Because of the cracked windshield, Nunemacher activated his squad car lights, and parked behind the car.
Nunemacher got out of the squad and walked to the driver's side of the car while Oesterlin approached the passenger side. At the same time, the driver was getting out of the car and was about to stand up when Nunemacher asked her if she was the owner of the car. She responded that she was Beverly McDonald, the car owner's sister. The driver was later identified as Beverly Varnado, the car owner's sister, but whom Nunemacher had never encountered before. Nunemacher asked Varnado for her driver's license or some other form of picture identification. Varnado fully cooperated with Nunemacher. When Varnado said she did not have any identification with her, Nunemacher asked her to sit in the backseat of the squad car while he checked the status of her driver's license.
But before Varnado got into the squad car, Nunemacher frisked her. Nunemacher testified that he always frisks people before placing them in the back of his squad car. He did not find any weapons when he checked the leather jacket Varnado was wearing. He then lifted her jacket and saw a large bulge in her right front pants pocket. The bulge in the top portion of her pocket was smooth and there was another bulge beneath it that had a textured look to it. Nunemacher testified that the lower part of the bulge was visually consistent with how crack cocaine would look in the pocket. When Nunemacher asked Varnado what it was she said it was her rent money and she moved her hand toward her pocket. Nunemacher pulled her hand away and then patted the pocket.
*889 Nunemacher testified that the top of the bulge did not feel like it was a weapon and it could have been an extremely large amount of money. He then patted the lower portion of Varnado's pocket. It felt like small individual "rocks" that were wrapped, which, through his experience as a police officer, he strongly suspected was crack cocaine. He asked Varnado, "Is this your dope?" Without denying that it was dope, Varnado said "No, that's not mine." Nunemacher then reached inside Varnado's pocket and removed $2,000 in cash and a small bag containing individual packages of crack cocaine. Nunemacher arrested Varnado for possession of a controlled substance.
Varnado moved the district court to suppress the crack cocaine as a fruit of an illegal search. The court granted her motion, concluding that Nunemacher did not have a sufficient basis to conduct the pat-down search of Varnado. Consequently, the court dismissed the complaint for lack of probable cause. The court denied the state's subsequent motion to reconsider noting that Nunemacher's actions, "although arguably justified as a search incident to arrest, are pretextual in nature and designed to conduct a warrantless search of the defendant's person for controlled substances [and were therefore] per se unreasonable, not subject to any exception." The state appealed[1] and the court of appeals reversed the district court, holding that Nunemacher properly seized the crack cocaine while conducting a valid pat-down search for weapons. We conclude that the frisk was neither justified as a protective frisk for weapons, nor as a search incident to a lawful arrest. Therefore, we reverse the court of appeals and reinstate the decision of the district court.
The Fourth Amendment prohibits an officer from searching an individual without a warrant, "subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); see also Wold v. State, 430 N.W.2d 171, 174 (Minn.1988). The state alleges that the following three such exceptions apply in this case: (1) a protective frisk for weapons; (2) a routine police procedure conducted for officer safety; and (3) a search incident to a lawful arrest. We address each exception individually.

I.
The state first contends that Officer Nunemacher properly conducted a pat search for weapons. An officer may conduct a limited protective weapons frisk of a lawfully stopped person if the officer reasonably believes that the suspect might be armed and dangerous and capable of immediately causing permanent harm. Terry v. Ohio, 392 U.S. 1, 24, 27, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); see 4 Wayne R. LaFave, Search and Seizure § 9.5(a), at 246 (3d ed.1996); Wold, 430 N.W.2d at 174. In this case, we agree that the officers were justified in stopping Varnado because they had probable cause to believe she was violating a traffic regulation by driving a car with a shattered windshield. However, we conclude that Nunemacher did not have a reasonable belief that Varnado may be armed and dangerous.
Varnado was stopped for driving with a cracked windshield, which is a minor traffic violation and a petty misdemeanor.[2] A petty misdemeanor does not constitute a crime.[3] We have said that "[p]olice officers may not ordinarily make searches upon apprehending motorists for simple traffic violations or upon the slightest hint of illegality." State v. Harris, 265 Minn. 260, 268, 121 N.W.2d 327, 333 (1963) cert. denied, 375 U.S. 867, 84 S.Ct. 141, 11 L.Ed.2d 94 (1963). See also State v. Gannaway, 291 Minn. 391, 392-93, 191 N.W.2d 555, 556 (1971); State v. Curtis, 290 Minn. 429, 431, 190 N.W.2d 631, 633 (1971); State v. Clifford, 273 Minn. 249, 254, 141 N.W.2d 124, 127-28 (1966). The state argues that these cases were limited by United States v. Robinson, 414 U.S. 218, 94 S.Ct. *890 467, 38 L.Ed.2d 427 (1973). The Robinson Court, in upholding a search as a lawful search incident to arrest, stated it was not inclined "to qualify the breadth of the general authority to search incident to a lawful custodial arrest on an assumption that persons arrested for the offense of driving while their licenses have been revoked are less likely to possess dangerous weapons than are those arrested for other crimes." Id. at 234, 94 S.Ct. 467.
The state's reliance on Robinson is misplaced. The search in Robinson was a search incident to a custodial arrest, unlike the analysis here, which only involves a frisk for weapons. The Robinson Court itself observed:
It is scarcely open to doubt that the danger to an officer is far greater in the case of the extended exposure which follows the taking of a suspect into custody and transporting him to the police station than in the case of the relatively fleeting contact resulting from the typical Terry-type stop.
Id. at 234-35, 94 S.Ct. 467. A typical Terry-type stop is precisely what is at issue here. Therefore, Robinson does not limit our long-held conclusion that during a routine stop for a minor traffic violation, a pat-down search is improper unless some additional suspicious or threatening circumstances are present.
There were no such circumstances in this case. In addition to the innocuous nature of the basis for the stop, the circumstances of the stop itself were neither threatening nor suspicious. Varnado was alone while two officers conducted the stop. Varnado fully cooperated with the officers' requests and did not make any furtive or evasive movements. See State v. Dickerson, 481 N.W.2d 840, 843 (Minn.1992), aff'd 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (reiterating that evasive conduct may give rise to reasonable suspicion). The officers had no reason to believe that she had a criminal history of any kind. In short, there were no circumstances that would reasonably lead the officers to believe that Varnado may have been armed and dangerous.
The state counters that the stop occurred at night in an area where there was suspected drug trafficking, which brings with it weapons and violence. However, both officers testified that the area was well lit. Indeed, it was bright enough for the officers to see a bulge in Varnado's front pants pocket. In addition, we have explained that presence in a high-crime area is insufficient to justify a stop. Dickerson, 481 N.W.2d at 843. We likewise conclude that without more, presence in a high-crime area is insufficient to justify a frisk after a lawful stop for a minor traffic violation. Finally, the state emphasizes that Varnado's sister, whose car Varnado was driving, was a suspected drug dealer. However, mere association with a suspected drug dealer does not provide a reasonable basis to suspect that a person may be armed and dangerous. Suspected illegal activity of one family member who is not present may not be imputed to another for purposes of justifying a frisk. Because Nunemacher did not have a reasonable basis to suspect that Varnado might be armed and dangerous, the frisk for weapons was not justified.

II.
As an alternative basis for the frisk, the state argues that Nunemacher was simply following his standard procedure before placing Varnado in the back of the squad car. The state requests that this court adopt a blanket rule allowing officers to require lawfully stopped citizens to sit in the back of squad cars and to frisk such citizens before they enter a squad car. We addressed this issue in Curtis and essentially rejected such a rule. 290 Minn. at 429, 190 N.W.2d at 631. We explicitly do so here.
In Curtis, police officers stopped the defendant for a traffic violation and found marijuana when they frisked him. Id. at 429-30, 190 N.W.2d at 632. At the defendant's suppression hearing, the officers indicated that the sole purpose for stopping the defendant was to make a license check. Id. at 430, 190 N.W.2d at 632. The officer who frisked the driver said he did so because they were going to put him in the squad car and they always conduct a frisk before putting someone in their squad. Id. at 430-31, 190 N.W.2d at 632-33. This court held that "[t]his was a routine arrest for a trivial traffic offense and nothing more [and][u]nder such circumstances, the weight of authority *891 holds that a search of the driver's person is unlawful and violates [the Fourth Amendment]." Id. at 431, 190 N.W.2d. at 633. We explained further that:
We are not to be understood as holding that police have no right, for their own protection, to search a person before placing him in a squad car if there is a valid reason for requiring him to enter the vehicle and it is not merely an excuse for an otherwise improper search. Examples of what may constitute probable cause[4] for a search are circumstances where (a) a motorist is known by the police to be habitually armed or to have a record of assaultive behavior, or (b) [a motorist] assumes a hostile and threatening attitude when stopped, or (c) the police, after stopping [a motorist], by cursory observation and without a search have valid reason to believe the motorist is engaged in the commission of a more serious crime.
Id. at 437, 190 N.W.2d at 636.
At the time Nunemacher frisked Varnado, none of these circumstances were present. Nor were there alternative factors that provided a reasonable basis for requiring Varnado to wait in the squad car. Nunemacher claims he put Varnado in the squad for safety reasons. Yet, he testified that he could have had Officer Oesterlin watch Varnado while he was verifying her name and driver's license status. Both officers agreed that Varnado was cooperative and made no evasive or furtive movements. The car was parked and the squad car was behind it, leaving Varnado no opportunity to elude the officers. Consequently, the officers did not have a reasonable basis for forcing Varnado to sit in the back of the squad car.
Nevertheless, the state relies on Pennsylvania v. Mimms to argue that Nunemacher's actions were lawful under the Fourth Amendment. 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977). In Mimms, the Court held "that once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment." Id. at 111 n. 6, 98 S.Ct. 330. The Court placed great weight on the officer's safety, reasoning that "[e]stablishing a face-to-face confrontation diminishes the possibility, otherwise substantial, that the driver can make unobserved movements * * *, reduc[ing] the likelihood that the officer will be the victim of an assault." Id. at 110, 98 S.Ct. 330. The Court also noted that asking the driver to step out of the car is a minimal additional intrusion after already being lawfully stopped. Id. at 111, 98 S.Ct. 330. The state argues that the same analysis applies to conducting a frisk when placing a motorist in the back of a squad pursuant a stop for a minor traffic violation. We disagree.
First, conducting a pat-down search is significantly more intrusive than merely asking a person to step out of a car. Second, such an application would circumvent Terry. Terry requires that a frisk pursuant to a lawful stop be based on a reasonable belief that the stopped person may be armed and dangerous. Terry, 392 U.S. at 24, 27, 30, 88 S.Ct. 1868. Under the state's proposed rule, however, no articulable suspicion would be necessary for a frisk. Any stop for a minor traffic violation when the driver does not have a driver's license with them would ultimately provide sufficient cause for a frisk because an officer would merely have to request that a stopped person wait in the squad car during the license check. Such a procedure would essentially eliminate any Fourth Amendment protection against unreasonable searches in traffic stops.
Nonetheless, we agree that officer safety is a paramount interest and that when an officer has a valid reasonable basis for placing a lawfully stopped citizen in a squad car, a frisk will often be appropriate without additional individual articulable suspicion. However, the inability of a minor traffic violator to produce a driver's license in and of itself is not a reasonable basis to require the driver to sit in the back of a squad car. We will not allow officers to contravene the reasonableness requirement of the Fourth *892 Amendment simply by requesting that a person sit in the squad car. Thus, Nunemacher's standard procedure of frisking persons prior to placing them in his squad car is insufficient to justify the frisk in this case.
We note also that the district court concluded that Nunemacher's purported frisk for weapons was pretextual and designed to conduct a warrantless search for narcotics. The state responds that under Whren v. United States, Nunemacher's subjective motive for the frisk is irrelevant as long as there was an objective basis for it. 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996). In Whren, the Court upheld a traffic stop where officers used a valid objective basis  probable cause that the driver committed a minor traffic violation  as a pretext for stopping a driver they suspected possessed narcotics. Id. at 809, 819, 116 S.Ct. 1769. In doing so, the Court stated that an officer's "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Id. at 813, 116 S.Ct. 1769. A critical distinction, however, between Whren and this case, is that the officers here had neither probable cause to search for weapons or narcotics, nor did they have probable cause to believe that Varnado was engaged in committing a crime for which a search would be reasonable. Rather, the state merely asserts that the frisk of Varnado was valid as a part of Nunemacher's routine procedure before placing people in the back of his squad. For intrusions that are not based on probable cause, such as the frisk here, we have held that the pretext factor is relevant to determining whether the intrusion is reasonable. State v. Holmes, 569 N.W.2d 181, 187-89 (Minn.1997) (holding that where officer's sole motivation for conducting inventory search of automobile was to discover a gun, the search was invalid).

III.
The state also argues that because Nunemacher had probable cause to arrest Varnado for the misdemeanor of failing to carry a driver's license while driving, the frisk of Varnado was valid as a search incident to arrest. "[I]t is reasonable for [an] arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or * * * escape" and "to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." Chimel v. California, 395 U.S. 752, 763, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). A search incident to arrest is valid by itself and does not require any additional justification. Robinson, 414 U.S. at 235, 94 S.Ct. 467. Furthermore, the formal arrest need not precede the search as long as the fruits of the search are not the basis for the probable cause to arrest and the arrest is contemporaneous with the search. Rawlings v. Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). State v. White, 489 N.W.2d 792, 794, n. 1, n. 2 (Minn.1992). However, the crime for which there is probable cause to arrest must be a crime for which a custodial arrest is authorized. Robinson, 414 U.S. at 235, 94 S.Ct. 467; State v. Martin, 253 N.W.2d 404, 405-06 (Minn.1977).
When Nunemacher frisked Varnado, he had probable cause to arrest her for failure to have a driver's license in her possession while operating a motor vehicle, which is a misdemeanor carrying a maximum penalty of a $700 fine and/or 90 days in jail. See Minn.Stat. §§ 171.08, 171.241 (1996). A driver can only be convicted of this offense, however, if the driver cannot later produce a valid driver's license. See Minn.Stat. § 171.08. The Minnesota Rules of Criminal Procedure permit a custodial arrest for misdemeanors only under certain circumstances. Minnesota Rule of Criminal Procedure 6.01, subd. 1(1)(a) provides:
Law enforcement officers acting without a warrant, who have decided to proceed with prosecution, shall issue citations to persons subject to lawful arrest for misdemeanors, unless it reasonably appears to the officer that arrest or detention is necessary to prevent bodily harm to the accused or another or further criminal conduct, or that there is a substantial likelihood that the accused will fail to respond to a citation. The citation may be issued in lieu of an arrest, or if an arrest has been made, in lieu of continued detention. If the defendant is detained, the officer shall report to the court the reasons for the detention. Ordinarily, for *893 misdemeanors not punishable by incarceration, a citation shall be issued.
(Emphasis added). The record is absent of facts supporting a belief that a custodial arrest was necessary to prevent Varnado from hurting someone or to ensure that she would respond to a citation. See State v. Brown, 345 N.W.2d 233, 237 (Minn.1984) (upholding a custodial arrest for a misdemeanor where officer knew that defendant had previously failed to appear for citations issued to him). There being no valid basis for a custodial arrest at the time Nunemacher initiated the frisk in this case, the frisk was not a proper search incident to arrest. See Martin, 253 N.W.2d at 405-06 (holding that under Minn. R. Crim. P. 6.01, subd. 1(1)(a), officer could not subject defendant to custodial arrest for petty misdemeanor and therefore, search was not valid as incident to arrest).
Moreover, Varnado was ultimately arrested not for failure to have her driver's license, but for possession of a controlled substance. While an arrest for a crime other than the one that provided the basis for the frisk will not alone invalidate the search,[5] it is one factor we will consider when assessing the validity of a search incident to arrest. A careful analysis of a search incident to arrest is prudent because, unlike a protective weapons search, a search incident to arrest is very broad in scope; it may include pockets, containers, and even the passenger compartment of automobiles. If what took place here was valid as a search incident to arrest, then any person who is stopped for a minor traffic violation and who does not have a driver's license with them, may be subjected to a full scale search, without any articulable suspicion. Again, such a procedure would eviscerate the Fourth Amendment's protection against unreasonable seizures. Indeed, what occurred in this case was more akin to an arrest incident to a search.
In conclusion, we hold that no exception to the search warrant requirement applies in this case and Nunemacher's frisk of Varnado was invalid under the Fourth Amendment. Therefore, we reverse the court of appeals and reinstate the trial court's order to dismiss the complaint.
Reversed.
GILBERT, Justice (dissenting).
I respectfully dissent from the majority opinion regarding whether Nunemacher acted appropriately when he requested that Varnado sit in the back of the squad car. I agree with the majority that during a routine traffic stop for a minor traffic violation police officers may not request a lawfully-stopped person to sit in the squad car without a reasonable basis. However, I disagree with the majority's conclusion that the officer did not have a reasonable basis in this case.
Nunemacher stopped Varnado for driving a car with a cracked windshield and that stop is not being contested. Varnado did not have any identification on her, including a driver's license. Failure to have a driver's license while operating a motor vehicle is a misdemeanor carrying a maximum penalty of $700 or 90 days in jail. Minn.Stat. §§ 171.08 (1996), 171.241 (1996), 609.02, subd. 3 (1996). At this point, Nunemacher had grounds to charge Varnado with a misdemeanor and run a driver's license check and to determine whether Varnado had any outstanding warrants. This verification required additional time during which Nunemacher would not be able to ensure his own safety.
Under the circumstances of this stop, Nunemacher's interest in protecting himself and Osterlin provided a reasonable basis to request that Varnado sit in the squad car while he ran a computer check. While the reason for the stop was a cracked windshield, which was in itself trivial, the factors surrounding the stop rendered it to be a potentially dangerous situation. Nunemacher knew that Varnado was driving a car that was owned by a suspected drug dealer. The stop occurred in early November at night in an area known for illegal drug trafficking and weapons. Nunemacher testified that as he approached Varnado she was exiting her car. Nunemacher did not recognize Varnado as the owner of the car and had not yet verified her identity. Varnado was wearing a bulky jacket under which a weapon could have been concealed. These additional facts sufficiently raised the level of potential danger to the officers' safety to provide a reasonable basis for Nunemacher's request that Varnado sit in *894 the squad car. See State v. Mertz, 362 N.W.2d 410, 413 (N.D.1985) (holding that officers ordering person to sit in squad car during issuance of a speeding citation was justified by legitimate public-policy concerns regarding officer safety).
Once Nunemacher had a reasonable basis for requesting that Varnado wait in the squad car, the frisk was valid without additional individual articulable suspicion. Once in the squad car, Nunemacher's attention would be focused on verifying information about Varnado while Varnado sat closely to him, presumably facing his back. Under these circumstances, Nunemacher did not need any additional individual suspicion to frisk Varnado for weapons before placing her in the squad car. For these reasons, there was no Fourth Amendment violation when Nunemacher frisked Varnado.
NOTES
[1] The state initially appealed from the district court's order dismissing the complaint. When the state brings a pretrial appeal, it must show that the district court erred and unless reversed, the error will have a critical impact on the outcome of trial. State v. Joon Kyu Kim, 398 N.W.2d 544, 547 (Minn.1987). As the district court dismissed the complaint, the critical impact test is met in this case.
[2] See Minn.Stat. §§ 169.71, subd. 1 (1996), 169.89, subds. 1, 2 (1996).
[3] See Minn.Stat. § 609.02, subd. 4a (1996).
[4] While we used the term "probable cause" in Curtis, we are not suggesting here that officers must have probable cause before frisking a lawfully stopped person or before requesting that the person wait in the squad car. But we are concluding that a reasonable basis must exist for both.
[5] See State v. White, 489 N.W.2d 792, 794 (Minn. 1992).