2012 COA 179

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Brent Richard BERDAHL, Defendant–Appellant.**

**No. 11CA0423.**

Colorado Court of Appeals, Div. IV.

Oct. 25, 2012.

§ 24–51–1105, C.R.S.2012.

John W. Suthers, Attorney General, Nicole D. Wiggins, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Douglas K. Wilson, Colorado State Public Defender, Britta Kruse, Deputy State Public Defender, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge LICHTENSTEIN.

¶ 1 Defendant, Brent Richard Berdahl, appeals the judgment of conviction entered on jury verdicts finding him guilty of possession of a schedule II controlled substance, a class six felony, and possession of drug paraphernalia, a class two petty offense. Defendant's sole contention on appeal is that the trial court erred in denying his motion to suppress evidence. Specifically, he asserts that the pat-down search of his person was unconstitutional because the police had no reasonable and articulable suspicion that he was involved in criminal activity or that he was armed and dangerous. We reverse the order and remand the case for further findings on the suppression issue.

## I. Background

### A. Suppression Hearing

¶ 2 The following facts were presented through testimony at the suppression hearing.

¶ 3 On January 10, 2010, at approximately 6:30 a.m., a Weld County deputy sheriff was dispatched on a "check well-being" and "motorist-assist" call. In route to the area, the deputy saw defendant walking along the side of the highway. The sun had not yet risen, and it was possibly "below freezing" outside. The deputy activated his emergency lights to make drivers aware that he and defendant were next to the roadway. He got out of his patrol car, introduced himself to defendant, and observed that defendant was not properly dressed for the cold weather and was "close to hypothermic." Defendant told the deputy that he had run out of gasoline earlier the previous evening. The deputy asked if defendant wanted to get into the backseat of the patrol car to warm up. Defendant

agreed to do so, and the deputy did a brief pat-down search for weapons before defendant got into the car.

¶ 4 While in the backseat, defendant refused the deputy's offer of medical care or assistance, but said his girlfriend was still in his stranded vehicle. The deputy drove to the vehicle and saw a barrel in which defendant and his girlfriend had apparently attempted to start a fire. Defendant's girlfriend was inside the vehicle and was extremely cold. The deputy asked her whether she wanted to get into the backseat of the patrol car, and she agreed. The record does not reflect whether the deputy also patted her down for weapons.

¶ 5 The girlfriend told the deputy that she and defendant had tried to call for assistance, but that no one she called would come out to help them. The deputy then tried to make arrangements to help defendant and his girlfriend, as their cell phone batteries were dead. The deputy called several service stations requesting delivery of some gasoline to help get the pair to the nearest station. But no station agreed to come because neither defendant nor his girlfriend had any money. The deputy testified that he did not investigate any crime, nor did he suspect one had been committed, and that defendant had been extremely cooperative with him.

¶ 6 At that point, a state trooper arrived and activated his lights to make approaching motorists aware that his car was partially in the road. The trooper testified that "it was frigid" that morning. The deputy explained the situation to the trooper, and the trooper offered to transport defendant and his girlfriend to a service station in Kersey. The trooper testified he offered to take them to Kersey because he was concerned for their welfare in light of the cold. Defendant and his girlfriend agreed to go with the trooper and got out of the deputy's vehicle. The trooper asked them both to collect any belongings from their vehicle, which they did. The trooper then testified:

> Both the male and female approached my vehicle and I explained to both of them that I was just going to conduct a quick pat-down frisk for any weapons, and at which point [defendant] immediately went over to the trunk of my patrol car, put his hands on the trunk, spread his legs and I commenced with a quick pat-down of his person.

¶ 7 The trooper testified that, although he did not believe any criminal activity had occurred, he performed the pat-down search on defendant, because "[i]t's an officer-safety practice when you're putting someone in the back of your patrol car."

¶ 8 The trooper said he felt a hard, cylindrical object on defendant's left ankle. When he asked defendant to identify it, defendant did not speak but rather pulled up his jeans, pulled out a sock, and displayed a drug pipe within the sock. The trooper said that, in his training and experience, "anything concealed in and around anybody's person or their ankles, it's either a weapon or contraband, one of the two." The trooper asked if defendant had anything else, "at which point [defendant] immediately reached down, lifted up his right pant, his right ankle, and pulled out a little blue zipper bag," which he handed to the trooper without speaking.

¶ 9 The trooper did not look inside the bag, but instead opened the patrol car door and defendant got inside. The girlfriend then got into the back of the car. The deputy, whom the trial court found more credible on this point, testified that the trooper did not pat down the girlfriend. The trooper then drove them to the service station in Kersey, where the trooper allowed the girlfriend out of the car and gave her some of his own money so that she could make calls or try to get some gasoline.

¶ 10 The trooper then examined what he had recovered from defendant and determined that it was drug paraphernalia and possible methamphetamine. He secured the evidence, handcuffed defendant, transported him to the jail, and booked him.

## B. The Trial Court's Findings

¶ 11 The trial court determined that, considering the totality of the circumstances, the initial encounter between defendant and the officers was consensual. The officers did not suspect defendant of any wrongdoing, used conversational tones of voice, and did not

request or demand information in a confrontational manner. The officers' only reason for contacting defendant was to offer assistance. However, the court determined that, after the trooper also arrived on scene and told defendant he was going to conduct a pat-down search for concealed weapons, the encounter ceased to be consensual.

¶ 12 The trial court concluded that defendant was in an emergency situation because of the cold and his broken-down vehicle such that he had "no choice" but to submit to the pat-down search. The court stated that it "[could not] ignore the predicament the defendant found himself in, and pretend that the defendant could have reasonably made the choice to remain in an isolated area, without heat or proper clothing, and thereby risk his life and health to the cold." Citing *People v. Fines*, 127 P.3d 79 (Colo.2006), the court noted that the encounter in this case, while initially consensual, ceased to be consensual when it became apparent that defendant had no way of getting out of the cold unless he accepted a ride in one of the police cars. It concluded, on this basis, that defendant's subsequent consent to search was not voluntary because he could only make one choice—submit to the pat-down search in order to be transported to a safe location.

¶ 13 However, the court determined that the pat-down search was constitutionally permissible because it was reasonable under the circumstances for officer safety, and, hence, the discovery of the pipe and recovery of the bag containing methamphetamine were also permissible. Thus, the court denied defendant's motion to suppress the evidence obtained during the search.

## II.   Discussion

¶ 14 Defendant contends that the trial court erred in determining that the search was constitutionally permissible. We agree that the search was not constitutionally justified for purposes of officer safety, but conclude that a remand is required for further findings under the legal standard set forth in *People v. Magallanes–Aragon*, 948 P.2d 528 (Colo.1997), to determine whether the search was otherwise justified if based on defendant's voluntary consent to the search.

## A.   Standard of Review

¶ 15 In reviewing a trial court's ruling on a motion to suppress evidence, we defer to the court's findings of historical fact but review its legal conclusions de novo. *People v. King*, 16 P.3d 807, 812 (Colo.2001); *People v. Scheffer*, 224 P.3d 279, 283 (Colo. App.2009). We must determine whether the trial court's legal conclusions are supported by sufficient record evidence and whether the court applied the correct legal standard. *See King*, 16 P.3d at 812; *Scheffer*, 224 P.3d at 283.

## B.   Law and Analysis

¶ 16 A warrantless search is presumptively invalid under the Fourth Amendment to the United States Constitution and article II, section 7, of the Colorado Constitution, subject to only a few narrowly delineated exceptions. *People v. Dandrea*, 736 P.2d 1211, 1216 (Colo.1987). "The constitutional test of a warrantless search ultimately is reduced to the question of whether the search was reasonable under all relevant attendant circumstances." *Id.*

### 1.   Reasonableness

¶ 17 Defendant contends the trial court erred in determining that the warrantless pat-down search was constitutionally reasonable under the circumstances. We agree.

¶ 18 Here, the trial court concluded that "it is reasonable under the Fourth Amendment for an officer to require a citizen involved in a consensual encounter to submit to a pat-down search prior to riding in an officer's patrol car." A warrantless search must meet the ultimate requirement of reasonableness. *People v. Casias*, 193 Colo. 66, 72, 563 P.2d 926, 930 (1977). The Fourth Amendment imposes "a standard of reasonableness upon the exercise of discretion by government officials including law enforcement agents, in order to safeguard the privacy and security of individuals against arbitrary invasions." *People v. Taylor*, 41 P.3d 681, 686 (Colo.2002) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653–54, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). For a warrantless

search to be reasonable, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" the intrusion of a search. *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In a "stop and frisk" situation,

> where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, ... he is entitled for the protection of himself and others ... to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

*Id.* at 30, 88 S.Ct. 1868.

¶ 19 Law enforcement officers may justifiably contact an unsuspicious person when other legitimate official reasons exist, such as when an officer is performing his duty to aid a motorist. *See People v. Davis*, 39 Colo.App. 63, 67, 565 P.2d 1347, 1350 (1977). But during that contact, a protective search for a weapon "is justified only when the circumstances of an otherwise valid stop provide the officer with a reasonable basis to suspect that the person with whom he is dealing may be armed and dangerous." *People v. Ratcliff*, 778 P.2d 1371, 1376–77 (Colo. 1989); *accord* § 16–3–103, C.R.S.2012 (peace officer may stop a person he reasonably suspects to be involved in a crime and may conduct a pat-down search for weapons of that person if he reasonably suspects his personal safety requires it).

¶ 20 Here, the deputy and the trooper testified that defendant was not intoxicated and that they did not have any suspicion that he was or had been involved in a crime, or that he might be armed and dangerous. Instead, the trooper patted down defendant as an "officer-safety practice." There was no testimony at the hearing regarding an official departmental policy regarding pat-down searches, and the deputy, whom the court found to be more credible than the trooper on this point, testified that the trooper did not pat down defendant's girlfriend before she entered the patrol car.

¶ 21 In its analysis, the trial court relied on *Dandrea*, 736 P.2d at 1212. However, this reliance was misplaced. In *Dandrea*, the defendant was a passenger in a truck stopped by police. *Id.* The driver was arrested for driving under the influence, and the officers concluded that the defendant was intoxicated after he had slipped and grabbed the door of the truck after he got out of the vehicle. *Id.* It was cold outside and the stop had occurred on an isolated mountain road. *Id.* Out of concern for the defendant's safety, the officers decided to take him into civil protective custody and transport him to a detoxification facility. *Id.* Pursuant to a departmental policy, an officer performed a pat-down search for weapons and discovered cocaine. *Id.* at 1212–13 & n. 3.

¶ 22 The supreme court observed that the Alcoholism and Intoxication Treatment Act, now codified as sections 27–81–101 to –117, C.R.S.2012, permitted law enforcement officers to take an intoxicated person into protective custody and to protect themselves "by reasonable methods[,] but [the officer] shall make every reasonable effort to protect the detainee's health and safety." *Id.* at 1214; *see also* § 27–81–111(1)(a), C.R.S.2012. The supreme court concluded that the initial pat-down search for weapons to ensure that the defendant would not harm himself or others while being transported was reasonable in light of the purposes of the Act and the attendant circumstances. *Dandrea*, 736 P.2d at 1218.

¶ 23 Here, defendant was not taken into civil protective custody, as the officers had no indication of intoxication. *Cf. People v. Hammas*, 141 P.3d 966, 968 (Colo.App.2006) (when a detainee is in civil protective custody, the government has a legitimate interest in the safety of the officer, the detainee, and others, and the detainee may be patted down for weapons). Thus, there was no applicable statutory provision permitting the trooper here to take protective action absent a reason to suspect that defendant might be armed and dangerous. *See, e.g.,* § 16–3–103.

¶ 24 The trial court also relied on a number of cases from other jurisdictions. *See,*

*e.g., People v. Tobin,* 219 Cal.App.3d 634, 269 Cal.Rptr. 81, 83–84 (1990) (finding pat-down searches of three men before placing them in patrol car reasonable where officer had duty to transport them off busy freeway); *People v. Queen,* 369 Ill.App.3d 211, 307 Ill.Dec. 400, 859 N.E.2d 1077, 1079, 1084–85 (2006) (finding pat-down of intoxicated man reasonable where officer acted for safety purposes according to departmental policy and only intended to give the man a ride home); *People v. Hannaford,* 167 Mich.App. 147, 421 N.W.2d 608, 609–10 (1988) (finding pat-down search reasonable where officer transported three men at their request late at night, where men had been drinking and officer could not contain their movement in patrol car); *State v. Lombardi,* 727 A.2d 670, 673–74, 676 (R.I.1999) (finding pat-down of intoxicated passenger, in validly stopped vehicle, reasonable where he had to be transported in police car).

¶ 25 We note, however, that other courts have declined to hold that an interest in officer safety arising solely from the decision to place an individual in a patrol car justifies a pat-down search. *See, e.g., United States v. Glenn,* 152 F.3d 1047, 1049 (8th Cir.1998) ("An officer's decision to place a traffic offender in the back of a patrol car does not create a reasonable, articulable suspicion to justify a pat-down search that the circumstances would not otherwise allow."); *Wilson v. State,* 745 N.E.2d 789, 793 (Ind.2001) (declining to hold that the Fourth Amendment allows police routinely to place traffic stop detainees in a police vehicle if this necessarily subjects the detainee to a pat-down search); *State v. Varnado,* 582 N.W.2d 886, 890 (Minn.1998) (rejecting a blanket rule that would allow officers to require lawfully stopped citizens to sit in the back of squad cars and to pat down such citizens before they enter a squad car); *State v. Brockel,* 746 N.E.2d 423, 427 (N.D.2008) (finding the district court erred in concluding as a matter of law that an officer could search the defendant before placing him in his patrol car, because either reasonable suspicion or voluntary consent is needed to justify a pat-down search).

¶ 26 The rationale of these cases is consistent with Colorado law. Colorado has adopted the *Terry* standard requiring that a pat-down search for weapons be supported by reasonable and articulable suspicion that the person searched may be armed and dangerous. *Ratcliff,* 778 P.2d at 1376–77. Neither the United States Supreme Court nor the Colorado Supreme Court has recognized a blanket patrol car exception to the *Terry* requirement. Indeed, the U.S. Supreme Court has "consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Ohio v. Robinette,* 519 U.S. 33, 34, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).

¶ 27 Nevertheless, the trial court appears to have applied a bright-line rule that an officer can conduct a pat-down search whenever he or she has an obligation to transport a person in a patrol car. The court found that the trooper had no real choice but to transport defendant, and "[t]he fact that defendant was not intoxicated did not eliminate or diminish a danger to [the trooper] if in fact the defendant was armed with a weapon." The court concluded that requiring the trooper to transport defendant without first verifying that defendant was not armed would require the trooper to take unnecessary risks in performing his duties and, therefore, the search was reasonable.

¶ 28 While we recognize that the trooper faces risks in performing his duties, we fail to see how such risks justify the search in this case. The trooper did not know if defendant or defendant's girlfriend was armed with a weapon. Thus, the trooper faced the same risk transporting defendant as he did transporting defendant's girlfriend. Despite this, the trooper subjected defendant to a pat-down search for weapons but did not search defendant's girlfriend. Furthermore, as noted, the trooper had no reasonable and articulable suspicion to believe defendant was intoxicated or otherwise a threat and there was no departmental policy requiring the pat down.

¶ 29 Under these circumstances—and where Colorado law has not recognized an officer safety exception absent a reasonable and articulable suspicion that an individual

may be armed and dangerous or intoxicated—we conclude that the trooper's pat-down search of defendant, conducted under his own "officer safety practice," was not a constitutionally reasonable search.

## 2. Consent

¶ 30 Alternatively, the People contend the trial court erred in ruling that defendant did not voluntarily consent to the search. We conclude a remand for further findings is required.

¶ 31 In determining the consent issue, the trial court focused only on the consensual nature of the encounter and applied the test articulated by our supreme court in *Fines:*

[a]n encounter between police officers and a citizen has ceased to be consensual, and the citizen has been seized within the meaning of the Fourth Amendment when, in the totality of the circumstances, a reasonable person in the citizen's position would no longer feel free to leave or to disregard the officers' requests.

127 P.3d at 81. However, we conclude that because defendant sought the trooper's assistance and offer of a ride in the patrol car, the focus of the inquiry is not on the consensual nature of the encounter. Rather, the focus is on the trooper's request that defendant submit to a warrantless pat-down search in order to obtain this assistance. Therefore, the applicable standard for determining whether defendant voluntarily consented to the search is the standard articulated in *Magallanes–Aragon.*

¶ 32 Under *Magallanes–Aragon,* "[a] warrantless search is constitutionally justified when it is conducted pursuant to voluntary consent." 948 P.2d at 530 (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). "Consent to search is voluntary if it is 'the product of an essentially free and unconstrained choice by its maker, and not the result of circumstances which overbear the consenting party's will and critically impair his or her capacity for self-determination." *Id.* (quoting *Schneckloth,* 412 U.S. at 225, 93 S.Ct. 2041). Voluntariness is to be assessed by considering the totality of the circumstances. *People v. Licea,* 918 P.2d 1109, 1112

(Colo.1996). The prosecution bears the burden of proving by clear and convincing evidence that consent to a search was voluntarily given. *Magallanes–Aragon,* 948 P.2d at 530–31.

¶ 33 To conclude that consent to search was voluntarily given, the court must find no objective evidence of police coercion, duress, deception, promises, threats, intrusive conduct, or other undue influence by the police in obtaining that consent. *Id.* at 531; *see Schneckloth,* 412 U.S. at 228–29, 93 S.Ct. 2041 (the voluntariness requirement of the Fourth Amendment is intended to insure that consent searches are "free from any aspect of official coercion").

¶ 34 The court must also consider a defendant's subjective characteristics, such as age, education, and knowledge, as well as the circumstances of the search, such as its location and duration, and the environment in which a defendant gives consent. *Magallanes–Aragon,* 948 P.2d at 531. The defendant's perceptions are also pertinent in determining the question of consent. *Id.*

¶ 35 Last, the trial court must apply an objective test and determine whether the police conduct could reasonably have appeared to the defendant to be coercive. *Id.* "It is the relationship between the police conduct and a person in the defendant's circumstances, and with the defendant's particular characteristics, which is critical to this determination." *Id.* Thus, when a court focuses exclusively on the defendant's subjective characteristics, perceptions, and environment without determining whether the police conduct was objectively coercive in relation to the defendant's subjective state, it applies an erroneous legal standard. *Id.* at 531–32.

¶ 36 Here, because the trial court relied only on the standard set forth for consensual encounters in *Fines,* its order does not contain the necessary findings as to each part of the test articulated in *Magallanes–Aragon.* Thus, we are unable to apply that test within our de novo review.

¶ 37 Consequently, we conclude that we must remand the case to the trial court with directions that it make additional findings of

fact and reconsider the consent issue under the appropriate legal standard. If the court again concludes that defendant did not validly consent to the search, the judgment of conviction shall be reversed and a new trial ordered, subject to the People's right to appeal the trial court's ruling. If the court concludes that defendant validly consented, the judgment shall be affirmed, subject to defendant's right to appeal.

¶ 38 The order is reversed and the case remanded for further proceedings consistent with this opinion.

Judge WEBB and Judge CARPARELLI concur.