STATE OF MINNESOTA

IN SUPREME COURT

A23-0459

Court of Appeals                                                                    Moore, III, J.
                                                                    Concurring, Hudson, C.J.
                                                                    Took no part, Gaïtas, J.


In the Matter of the Welfare of: C.T.B.                          Filed:  August 13, 2025
                                                                    Office of Appellate Courts


_____

Cathryn Middlebrook, Chief Appellate Public Defender, Sara L. Martin, Assistant State Public Defender, Saint Paul, Minnesota, for appellant C.T.B.

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Adam E. Petras, Linda M. Freyer, Assistant Hennepin County Attorneys, Liesl Holum, Certified Student Attorney, Minneapolis, Minnesota, for respondent State of Minnesota.

Teresa J. Nelson, Alicia L. Granse, American Civil Liberties Union of Minnesota, Minneapolis, Minnesota; and

Shauna F. Kieffer, Minnesota Association of Criminal Defense Lawyers, Minneapolis, Minnesota, for amici curiae American Civil Liberties Union of Minnesota and Minnesota Association of Criminal Defense Lawyers.

_____

S Y L L A B U S

Police officers did not have a reasonable, articulable suspicion that appellant was armed and dangerous when they conducted a pat-frisk of the appellant because mere proximity to a suspect in an alleged crime is not enough to support reasonable, articulable

1

suspicion for a warrantless pat-frisk.

Reversed and remanded.

O P I N I O N

MOORE, III, Justice.

We are asked here to determine whether police officers had reasonable, articulable suspicion under *Terry v. Ohio*, 392 U.S. 1 (1968), to conduct the pat-frisk of appellant C.T.B., which revealed that C.T.B. possessed a handgun. The district court denied C.T.B.'s motion to suppress the handgun as a result of the search. On appeal, the court of appeals affirmed the denial of the motion to suppress, concluding that based on the totality of the circumstances, the officers reasonably suspected that C.T.B. might be armed and dangerous when they conducted the pat-frisk. Because the totality of the circumstances establish that the officers lacked a reasonable, articulable suspicion that C.T.B. was armed and dangerous when they conducted the pat-frisk, we reverse and remand to the district court for further proceedings consistent with this opinion.

**FACTS**

Respondent State of Minnesota charged C.T.B. with unlawfully possessing a firearm while under 18 years old. *See* Minn. Stat. § 624.713, subd. 1(1) (2024) ("The following persons shall not be entitled to possess . . . a pistol or . . . any other firearm: a person under the age of 18 years . . . ."). C.T.B. moved to suppress the handgun police

2

found during a pat-frisk.[1]  According to C.T.B., the officers lacked a reasonable, articulable suspicion that he was armed and dangerous when they conducted the pat-frisk because, C.T.B. argues, mere physical proximity to a suspect involved in an alleged crime is not enough to support reasonable, articulable suspicion to conduct a warrantless search.

In response, the State argued that C.T.B.'s pat-frisk was a reasonable expansion of the search of the original suspect.  In the alternative, the State also argued that the officers had an independent, particularized basis to pat-frisk C.T.B.  The district court held an evidentiary hearing on the suppression motion.  Two of the arresting officers testified, and the State submitted as an exhibit a recording of the incident taken from one of the officer's body-worn camera as an exhibit.

The officers' testimony established these facts.  On December 27, 2022, police officers responded to a report that a man in a yellow and black coat (the "original suspect") was pointing a handgun at people at a light rail station in Minneapolis.  A few minutes later, the officers located the original suspect standing inside a nearby carryout pizza restaurant.  One of the officers "saw through the window [of the restaurant] a [B]lack male

_____

[1]     A pat-frisk is a carefully limited search of the outer clothing used by police to ascertain whether a person is armed and dangerous and may assault an officer.  *See Terry*, 392 U.S. at 24 (defining a frisk as "a limited search of the outer clothing for weapons").  We commented on this kind of search in *State v. Harris*, where we held that "[w]hen an officer has reasonable articulable suspicion that a person he has seized is armed and dangerous, the officer may conduct a protective pat-down search of the person's outer clothing in order to ascertain whether the person is armed."  590 N.W.2d 90, 104 (Minn. 1999).  We have sometimes referred to this type of limited search as a "pat-down search," *e.g.*, *State v. Sargent*, 968 N.W.2d 32, 35 (Minn. 2021), or a "*Terry* pat-down search," *e.g.*, *Matter of Welfare of G.M.*, 560 N.W.2d 687, 694 n.7 (Minn. 1997).  In this case, we use the term "pat-frisk."

wearing a yellow jacket with black sleeves." He also saw "maybe three or four" other people, including 16-year-old appellant C.T.B., all "close to each other," roughly within "a conversational distance" of the original suspect. That officer also testified that,

> From my experience, I know that if there's multiple individuals at one place and there's someone known to have a firearm, that sometimes it could be passed around to a different individual, especially when that suspect knows that we're looking for him or he was involved in an incident recently.

Based on these observations, one of the officers pat-frisked C.T.B. and found a handgun in the front pocket of his sweater.

The district court denied C.T.B.'s motion to suppress the handgun. The court found that, when officers arrived at the restaurant, the original suspect was "huddled in a group and conversing with three to four young men." It concluded that police "had a reasonable and articulable suspicion that [C.T.B.] was potentially armed and had a particularized constitutional basis to conduct a pat-frisk. . . based upon the officers' experience that weapons can often be passed off to another person in a group to evade detection and [C.T.B.]'s close proximity to the original suspect." It also concluded that the frisk of C.T.B. was a "permissible expansion of the *Terry* stop and frisk of the original suspect."[2]

---

[2]     We have never held that a valid pat-frisk of one person under *Terry* can be *expanded* to justify an independent and subsequent frisk of a second person who is simply present in the same location with the first person without an individualized reasonable, articulable suspicion that the second person is armed and dangerous and criminal activity is afoot. In this case, neither the district court nor the State has articulated a persuasive reason for such a holding.

In *Ybarra v. Illinois*, the United States Supreme Court rejected a similar argument. 444 U.S. 85, 96 (1979). Police officers had a warrant to search a tavern and one of its employees, but they expanded their search to pat-frisk several other customers who were merely present in the tavern and not suspected to be involved in criminal activity. *Id.* at 90.

C.T.B. requested a trial on stipulated facts pursuant to Minnesota Rule of Juvenile Delinquency Procedure 13.03, subdivision 3.  After a bench trial, the district court found C.T.B. guilty of unlawfully possessing a firearm while under the age of 18 because he "knowingly possessed a firearm while under the age of 18 . . . and [did] not fall into any of the categories that would exempt him from the application of [the ineligible-persons statute, Minn. Stat. § 624.713, subd. 1(1)]."[3]  The district court issued an order staying the adjudication of delinquency contingent on C.T.B. successfully following the conditions of probation.  *See* Minn. R. Juv. Delinq. P. 15.05, subd. 4(B) ("If the child is not held in detention, the court may continue the case without adjudication . . . .").

C.T.B. appealed, claiming that the district court erred by denying his motion to suppress evidence, specifically the handgun that arose from the pat-frisk.  In a nonprecedential opinion, the court of appeals affirmed.  The court did not address the

---

The Court explained that "[n]othing in *Terry* can be understood to allow a generalized 'cursory search for weapons' " and that the " 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked . . . .*" *Id.* at 93–94 (emphasis added).  We likewise reject the argument that the search of C.T.B. was justified as an "expansion" of the search of the original suspect.

[3]      C.T.B. does not argue that any exception applied to him.  *See* Minn. Stat. § 624.713, subd. 1(1) (allowing persons under 18 to possess certain kinds of ammunition and firearms "(i) in the actual presence or under the direct supervision of the person's parent or guardian, (ii) for the purpose of military drill under the auspices of a legally recognized military organization and under competent supervision, (iii) for the purpose of instruction, competition, or target practice on a firing range approved by the chief of police or county sheriff in whose jurisdiction the range is located and under direct supervision; or (iv) if the person has successfully completed a course designed to teach marksmanship and safety with a pistol or semiautomatic military-style assault weapon and approved by the commissioner of natural resources.").

"expansion" argument. Rather, it concluded that the totality of the circumstances made it "objectively reasonable for the [police] to think that the suspect had handed the firearm to one of the young men who was standing with the suspect when the police approached, including [C.T.B.]" *In re Welfare of C.T.B.*, No. A23-0459, 2023 WL 7478491, at *4 (Minn. App. Nov. 13, 2023). In doing so, the court of appeals inferred that the officers did not find the firearm that they were looking for on the original suspect. *Id.* at *1 ("Although the district court did not make a finding regarding whether the officers found a firearm when they pat-frisked the [original] suspect, the court's findings imply that they did not."). The court of appeals included this fact in the totality of the circumstances that justified C.T.B.'s pat-frisk. *Id.* C.T.B. filed a petition for review of the decision of the court of appeals, which we granted.

**ANALYSIS**

When reviewing the denial of a pretrial motion to suppress evidence, "we review the district court's factual findings for clear error and its legal conclusions de novo." *State v. Molnau*, 904 N.W.2d 449, 451 (Minn. 2017). The heart of the dispute here concerns whether police had a constitutional basis to pat-frisk C.T.B. The legality of an officer's warrantless pat-frisk turns on what we have characterized as the "*Terry* search exception" to the Fourth Amendment's probable cause and warrant requirements. *State v. Flowers*, 734 N.W.2d 239, 249 (Minn. 2007). Under both the United States Constitution and the Minnesota Constitution, people have the right to be secure in their persons, houses, papers, and effects against unreasonable searches. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Any search is presumptively unreasonable unless it is authorized by a warrant based

6

on probable cause or otherwise falls within an exception to these requirements. *State v. Dickerson*, 481 N.W.2d 840, 843 (Minn. 1992). One such exception was created by the United States Supreme Court's ruling in *Terry v. Ohio*, which held that—in certain circumstances—police could pat-frisk an individual without probable cause or a warrant. 392 U.S. at 27. We have held that the "principles and framework of *Terry*" also apply to cases arising under the Minnesota Constitution. *State v. Askerooth*, 681 N.W.2d 353, 363 (Minn. 2004).

The *Terry* exception to the probable cause and warrant requirements allows a police officer to conduct a pat-frisk of a person, meaning a carefully limited search of the outer clothing in an attempt to discover weapons, when the officer has a reasonable articulable suspicion that the person is "armed and dangerous" and "criminal activity may be afoot." *Terry*, 392 U.S. at 30. This reasonable articulable suspicion must be "directed at the person to be frisked." *Ybarra v. Illinois*, 444 U.S. 85, 96 (1979). We have also often remarked that the threshold for reasonable suspicion "is 'not high.' " *State v. Diede*, 795 N.W.2d 836, 843 (Minn. 2011) (quoting *State v. Timberlake*, 744 N.W.2d 390, 393 (Minn. 2008)). The reasonableness of an officer's suspicions is judged by "an objective examination of the totality of the circumstances." *State v. Lemert*, 843 N.W.2d 227, 230 (Minn. 2014). This examination is conducted "from the perspective of a trained police officer, who may make 'inferences and deductions that might well elude an untrained person.' " *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). The totality of the circumstances includes the "special training" and "experience" of a police officer. *State v. Sargent*, 968 N.W.2d 32, 38 (Minn. 2021).

Yet an officer's suspicion must be "more than an unarticulated hunch," and "the officer must be able to point to something that objectively supports [the officer's] suspicion." *State v. Johnson*, 444 N.W.2d 824, 825–26 (Minn. 1989) (citation omitted) (internal quotation marks omitted). Accordingly, we have rejected the automatic-companion rule, adopted by some jurisdictions,[4] which allows police to search "any person who is in the company of someone whom the officers have arrested." *Lemert*, 843 N.W.2d at 231, 232. "Mere proximity to, or association with, a person who may have previously engaged in criminal activity is not enough to support reasonable suspicion," absent some other factor. *Diede*, 795 N.W.2d at 844. Rather, "being a companion to an arrestee is part of the totality of the circumstances" considered in whether an officer's suspicion is reasonable. *Lemert*, 843 N.W.2d at 233.

In explaining that C.T.B.'s search was based on more than his mere proximity to the original suspect, the court of appeals relied in part on the fact that the police knew that the original suspect had recently brandished a firearm and failed to find that firearm when they searched the original suspect. *C.T.B.*, 2023 WL 7478491, at *4. But as the court of appeals noted, the district court did not find that the police failed to locate the firearm on the original suspect. *Id.* at *1. No officer testified to that fact and nothing else in the record supports that fact. Consequently, the court of appeals reliance on that fact was misplaced. For these

---

[4]     As C.T.B. notes, the automatic-companion rule has been adopted by the United States Courts of Appeals for the Fourth, and Ninth Circuits, but has been rejected by the Sixth and Eighth Circuits. *See United States v. Poms*, 484 F.2d 919, 922 (4th Cir. 1973); *United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971); *United States v. Bell*, 762 F.2d 495, 498 (6th Cir. 1985); *United States v. Flett*, 806 F.2d 823, 827 (8th Cir. 1986).

reasons, we conclude that the court of appeals erred in considering the fact that the firearm was unaccounted for as a part of the totality of the circumstances that justified C.T.B.'s pat-frisk.[5]

We now turn to the remaining facts that the court of appeals and the district court relied upon.

The district court found as a matter of fact that the original suspect was "huddled" in a group and "conversing" with three to four young men, including C.T.B. We must defer to this factual finding unless it is clearly erroneous. *State v. Ezeka*, 946 N.W.2d 393, 403 (Minn. 2020). In applying the clear-error standard, we view the evidence in the light most favorable to the findings. *In re Civ. Commitment of Kenney*, 963 N.W.2d 214, 221 (Minn. 2021). A factual finding is clearly erroneous "if it does not have evidentiary support in the record." *Id.* (citation omitted) (internal quotation marks omitted). For the reasons below, we conclude that even when the record is viewed in a light most favorable to the district court's findings, it fails to support a finding that the original suspect was "huddled" in a group and "conversing" with three to four young men, including C.T.B.

First, the record does not support a finding that any of the individuals were "conversing." One officer testified that the individuals were a "conversational distance"

---

[5]     Because it is clear that there is no basis in the record for the court of appeals' inference, it is not necessary to reach the issues discussed in the concurrence in order to conclude the court of appeals erred in considering a missing gun as part of the totality of the circumstances that could give rise to reasonable articulable suspicion. Judicial restraint "bids us to refrain from deciding any issue not essential to the disposition of the particular controversy before us." *Johnson v. State*, 956 N.W.2d 618, 623 n.4 (Minn. 2021) (quoting *Lipka v. Minn. Sch. Emps. Ass'n, Local 1980*, 550 N.W.2d 618, 622 n.9 (1996)).

9

from the original suspect, but never testified that they were actually conversing.  Likewise, even when viewed in a light most favorable to the district court's findings, the body-worn camera footage does not show any conversation.  We therefore conclude that the district court clearly erred in finding that C.T.B. was conversing with the original suspect.

Second, the record does not support a finding that C.T.B. was "huddled in a group" with the original suspect.  The word "huddled" is commonly understood to mean "to hold a consultation," which suggests a coordinated effort.  *Merriam-Webster Dictionary* 604 (11th ed. 2020).  The officers never used the word "huddled" in their testimony and reported only that the original suspect was "standing with other individuals."  When viewed in a light most favorable to the district court's findings, the officer's body-worn camera footage simply shows that for a few seconds, a group of people, including C.T.B., were standing just inside the entrance to the pizza restaurant looking out of the window at the approaching police officers.  C.T.B. was standing behind and apart from the others by the window; nothing in his posture or demeanor suggested any connection to the original suspect.  Nor did the body-worn camera footage show C.T.B. speaking to the others.  In short, the body-worn camera footage does not indicate that C.T.B. had any relationship to the original suspect aside from the fact that they were both standing close to the window for a few seconds.  The record clearly shows that several people were standing around in different areas of the restaurant, and as the officers approached, the men independently moved toward the window, gazed out of the window for a few seconds, and then went their separate ways.  We therefore conclude that the district court's finding that C.T.B. was "huddled" with the original suspect is clearly erroneous because "it does not have

evidentiary support in the record." *See Ezeka,* 946 N.W.2d at 403 (citation omitted) (internal quotation marks omitted).

Having concluded that the district court's factual finding that the original suspect was "huddled" in a group and "conversing" with three to four young men, including C.T.B., is clearly erroneous, we are left with the arguments that C.T.B.'s mere proximity to the original suspect and the officer's training and experience that weapons can be passed off to another person in a group to evade detection were sufficient to establish reasonable, articulable suspicion. We have previously held that proximity is not enough, by itself, to support reasonable suspicion. *Diede*, 795 N.W.2d at 844. In this case, we conclude that C.T.B.'s mere proximity to the original suspect, combined with the officer's general knowledge that people in groups may pass weapons to others to avoid detection, was not sufficient to create a reasonable, articulable suspicion to justify a *Terry* pat-frisk. The United States Supreme Court has explained that "the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion *directed at the person to be frisked . . . .*" *Ybarra*, 444 U.S. at 96 (emphasis added). On these facts, police officers' general knowledge that weapons *can* be passed to evade detection, without more, is not enough to justify a *Terry* search of every individual standing near the original suspect.

We recognize the legitimate concern for the safety of both the officers and the public when firearms are involved in a potential crime. *See State v. Varnado*, 582 N.W.2d 886, 891 (Minn. 1998) ("officer safety is a paramount interest"). But at a suppression hearing, the State bears the burden of proving that the police obtained the challenged evidence in accord with the United States and Minnesota Constitutions. *Molnau*, 904 N.W.2d at 451.

11

On the record before us, the State has not met its burden to prove that C.T.B.'s search was constitutional. Therefore, the district court erred when it denied C.T.B.'s motion to suppress the handgun.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the court of appeals and remand to the district court for further proceedings consistent with this opinion.

Reversed and remanded.

GAÏTAS, J., took no part in the consideration or decision of this case.

HUDSON, Chief Justice (concurring).

I agree with the court's decision to reverse C.T.B.'s conviction because law enforcement clearly had no reasonable, articulable suspicion to search him based solely on his proximity to a person who may have previously engaged in criminal activity. I write separately to expressly articulate that the timing of C.T.B.'s seizure—which is critical to the required analysis of the totality of the circumstances—also demonstrates that law enforcement lacked reasonable, articulable suspicion to search C.T.B. The court's reluctance to articulate the boundaries of reasonable, articulable suspicion and provide law enforcement and the public with practical guidance is troubling. Thus, I do so here.

Along with the officer's testimony, the body-worn camera footage shows the following events. An officer approached the glass door of the restaurant with his gun drawn and brought the original suspect outside the restaurant. Another officer instructed the first officer to detain the individuals inside the restaurant and began searching the original suspect. The first officer continued to stand in front of the door with his gun drawn and told the individuals inside who had been near the original suspect, including C.T.B., that they could not leave. About a minute later, the officers entered the restaurant and began frisking the individuals inside the store that they had observed standing near the original suspect, including C.T.B.

As we said in *Diede*, we will not consider facts that "did not yet exist" at the time of a seizure. 795 N.W.2d 836, 844 (Minn. 2011). A seizure occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a

citizen." *State v. Cripps*, 533 N.W.2d 388, 391 (Minn. 1995). While neither court below commented on the timing of the seizure, I conclude, based on the video evidence, that C.T.B. was seized when the officers approached the restaurant with guns drawn and prevented the individuals inside who had been standing near the original suspect, including C.T.B., from leaving. At that point, C.T.B.'s liberty was restrained by the officer's force and show of authority. *Id.* The video evidence shows that this seizure took place just as the officers began their search of the original suspect. Because that search was unfinished, the officers could not have known whether the original suspect still had the firearm that he had been recently observed with, and they therefore did not have reasonable, articulable suspicion to search C.T.B.